R. Alexander Saveri (173102)
Geoffrey C. Rushing (126910)
Cadio Zirpoli (179108)
Travis L. Manfredi (281779)
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, California  94111
Telephone: 415-217-6810
Facsimile: 415-217-6813
rick@saveri.com
grushing@saveri.com
cadio@saveri.com
travis@saveri.com

Benjamin D. Bianco (*pro hac vice pending*)
**FRANK & BIANCO LLP**
275 Madison Avenue, Suite 705
New York, New York  10016
Telephone:  212-628-1853
Facsimile:  212-682-1892
bbianco@frankandbianco.com

*Counsel for MicroTechnologies, LLC*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **MICROTECHNOLOGIES, LLC,** | Case No. 15-cv-2220: |
| **Plaintiff,** | |
| **v.** | |
| **AUTONOMY, INC. (also known as HP AUTONOMY),** | **COMPLAINT** |
| **Defendant,** | **JURY TRIAL DEMANDED** |
| **and** | |
| **HEWLETT-PACKARD COMPANY,** | |
| **Nominal Defendant.** | |

Plaintiff, MicroTechnologies, LLC ("MicroTech"), by and through its undersigned counsel, for its Complaint alleges against defendant Autonomy, Inc. (also known as HP Autonomy) ("Autonomy" or "Defendant"), and nominal defendant Hewlett-Packard Company ("HP" or "Nominal Defendant"), upon personal knowledge as to itself and its own acts, and as to all other matters upon information and belief, as follows:

## I.     NATURE OF THE CASE

1.     The cause of action herein is straightforward, MicroTech paid Autonomy for two software deals that Autonomy never completed and MicroTech wants its money back.  In other words, this dispute can be summed up in one simple sentence: Autonomy cannot keep both the $16.5 million paid and the software that was never delivered—what's fair is fair.

2.     Autonomy was a software developer based in England.  Autonomy, in or about 2006, entered into a reseller relationship with MicroTech whereby Autonomy would (i) agree to sell its software to an end-user; (ii) provide the details of any such transaction to MicroTech; (iii) request that MicroTech issue a purchase order to Autonomy for the software sold to the particular end-user; and, (iv) invoice MicroTech for the transaction.  After MicroTech had paid Autonomy for the software and the software had been delivered to the end-user, the end-user would pay for the software and the transaction would be complete, with MicroTech entitled to a defined percentage of the transaction, typically ten percent.  For many years, this relationship was very successful and beneficial to both Autonomy and MicroTech.

3.     The Complaint herein, however, arises from two transactions where Autonomy was paid by MicroTech, but where Autonomy never closed the deal and failed to return any money to MicroTech for the transaction—one transaction was with the Biblioteca Apostolica Vaticana (the "Vatican Library"), as the end-user, and the other was with nominal defendant HP, as the end-user (before HP subsequently acquired Autonomy).  Autonomy, despite (i) representing that it had an agreement to sell its software in each of these transactions; (ii) having given MicroTech the specific details of each of these two transactions; (iii) having received purchase orders from MicroTech for these transactions; (iv) having invoiced MicroTech for the purchase orders; and, (v) having been paid over $16.5 million by MicroTech ($9,221,331.71 for the

Vatican Library transaction and $7,350,000.00 for the HP—as the end-user—transaction), Autonomy never closed these deals.

4.    MicroTech brings this Action against defendant Autonomy, and nominal defendant HP, to recoup the money it paid to Autonomy on the transactions described above.

## II.    JURISDICTION AND VENUE

5.    The Court has jurisdiction over this Action, pursuant to 28 U.S.C. § 1332(a), because Plaintiff is a limited liability company residing in the State of Virginia, all defendants (Autonomy and HP) reside within the State of California, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.    The Court has personal jurisdiction over the defendants because all defendants (Autonomy and HP) reside within the State of California and the wrongful conduct alleged herein arose within the State of California.

7.    Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b), because all defendants (Autonomy and HP) reside in this District and the conduct alleged herein arose within this District.

## III.    PARTIES

### A.    Plaintiff

8.    MicroTechnologies, LLC is a Virginia limited liability company, with its principal place of business located at 8330 Boone Boulevard, Suite 600, Vienna, Virginia 22182.[1] MicroTech is a Service-Disabled Veteran-Owned Small Business that designs, develops, and delivers technology integration, telecommunications, and cloud solutions to public, private, and governmental enterprises in the United States and elsewhere.

---

[1]  Prior to February 2007, Plaintiff MicroTechnologies, LLC was operating as MicroTech, LLC. On or about February 8, 2007, MicroTech, LLC became MicroTechnologies, LLC.

**B.    Defendants**

9.    Autonomy, Inc. (also known as HP Autonomy), is a New Jersey corporation with its principal place of business located at 3000 Hanover Street, Palo Alto, California 94304.

**C.    Nominal Defendant**

10.    Hewlett-Packard Company is a corporation organized under the laws of State of Delaware, with its principal place of business located at 3000 Hanover Street, Palo Alto, California 94304, and is the parent company of Autonomy.    In or about October 2011, defendant HP acquired defendant Autonomy's parent company for $10.3 billion and created HP Autonomy.

## IV.    FACTUAL ALLEGATIONS

**A.    Background**

11.    On or about June 30, 2006, MicroTech entered into a master Reseller Agreement ("Reseller Agreement," attached hereto as Exhibit A) with Autonomy whereby MicroTech became an authorized reseller of Autonomy software to U.S. Government end-users, and mutually agreed upon commercial customers.    Reseller Agreement ¶¶ 2, 3.2.

12.    In practice, each of the Autonomy/MicroTech transactions under the Reseller Agreement—prior to the two deals at issue herein—took place substantially as follows:

    a.    Autonomy would agree to sell its proprietary software to an end-user with MicroTech acting as the reseller;

    b.    Autonomy would communicate the end-user's particular needs and requirements to MicroTech;

    c.    MicroTech would issue a purchase order to Autonomy for the software, listing the end-user and the specific details of the order as provided to MicroTech by Autonomy;

    d.    Autonomy would invoice MicroTech for the software;

    e.    MicroTech would pay Autonomy for the software and Autonomy would make the software available for transmission to the end-user;

    f.    The deal would close, the end-user would pay for the software, and the license keys to operate the software would be delivered by Autonomy to the end-user directly, or sometimes through MicroTech; and,

g. Finally, after Autonomy completed *software delivery*,[2] MicroTech would be paid back the invoice price, plus (typically) a ten percent profit.

13. In or about late-2009, despite having acted as a reseller exclusively on U.S. Government end-user transactions, MicroTech began entering into "commercial" (non-U.S. Government) reseller transactions—at the insistence of Autonomy—for Autonomy's software.

14. By the end of December 2009, MicroTech entered into approximately six commercial reseller deals with various entities, including Honeywell Corp., Morgan Stanley, and Manufacturers Life Insurance Co. Each of these 2009 commercial reseller transactions was fully performed by both MicroTech and Autonomy, with each such transaction following the deal structure set forth in paragraph 13.

**B.** **The MicroTech/Autonomy Contract for the Vatican Library Transaction**

15. In or about early-2010, Autonomy identified the Vatican Library as an end-user for Autonomy's proprietary software for the Vatican Library's manuscript archiving project.

16. According to representations made by Autonomy to MicroTech, the Vatican Library had agreed to purchase, with MicroTech as the reseller, Autonomy's proprietary software. As with previous Autonomy/MicroTech reseller transactions, Autonomy provided MicroTech with all the details of the purported transaction.

17. On March 31, 2010, MicroTech issued a purchase order to Autonomy for the Vatican Library transaction (the "MicroTech Vatican Library Purchase Order," attached hereto as Exhibit B) for $11,550,000.

18. Autonomy subsequently invoiced MicroTech for $11,550,000 on or about March 31, 2010. Over the course of the next fifteen months, MicroTech made several payments on the Vatican Library invoice, totaling $9,221,331.71. The final payment by MicroTech, of $2.4 million, was made to Autonomy on or about July 1, 2011.

---

[2] In order for the software to be fully "delivered," Autonomy must have provided not only software access to MicroTech or the end-user, but also have provided the license keys to use Autonomy's proprietary software. Indeed, the software alone is useless without the required license keys.

COMPLAINT

Case No. 15-cv-2220

19.     Between April 2010 and at least July 9, 2011, MicroTech engaged in numerous correspondence with Autonomy concerning the viability of, and balance due on, the Vatican Library deal.

20.     In or about late-2011, however, MicroTech came to believe that the Vatican Library deal would never close.  And, in or about March 2014, MicroTech learned that the Vatican Library had contracted with another software vendor for its manuscript archiving project, ending any possibility that the Vatican Library transaction could or would ever close.

21.     To date, Autonomy has collected and wrongfully retained $9,221,331.71 from MicroTech without having closed the software deal pursuant to the MicroTech Vatican Library Purchase Order by delivering the software to the Vatican, or having repaid MicroTech for the Vatican Library deal.

**C.     The MicroTech/Autonomy Contract for the Hewlett-Packard Transaction**

22.     In or about June 2011, Autonomy identified nominal defendant HP as a new end-user ("HP as End-User") for Autonomy's proprietary software.  According to representations made by Autonomy to MicroTech at the time, Autonomy fully negotiated the transaction whereby HP as End-User agreed to purchase, through MicroTech, Autonomy's proprietary software.  As with prior Autonomy/MicroTech reseller transactions, Autonomy provided MicroTech with all the details of the transaction.

23.     On June 30, 2011, MicroTech issued a purchase order to Autonomy for the HP as End-User transaction ("MicroTech HP Purchase Order," attached hereto as Exhibit C).  The MicroTech HP Purchase Order was for $7,350,000.

24.     MicroTech paid $7,350,000 to Autonomy for the HP as End-User deal on or about August 16, 2011.

25.     Much like the Vatican Library transaction, however, the HP as End-User deal never closed.  To date, Autonomy has collected and wrongfully retained $7.35 million from MicroTech for the HP as End-User transaction without having closed the software deal by delivering the software to HP, or having repaid MicroTech.

**D.      Hewlett-Packard Purchases Autonomy**

26.      In or about October 2011, shortly after MicroTech paid Autonomy for the HP as End-User transaction, nominal defendant HP acquired defendant Autonomy's parent company for $10.3 billion and created HP Autonomy.

27.      Shortly after consummating the acquisition of Autonomy, HP shareholders initiated in this District—among other jurisdictions—a derivative action over HP's purchase of Autonomy.   *See In re Hewlett-Packard Co. Shareholder Deriv. Litig.* (12-CV-6003-CRB) ("Derivative Action").   On September 14, 2014, in a filing in the Derivative Action, HP asserted that Autonomy's transaction regarding the Vatican Library was "fraudulent," and indeed "fake" from the beginning.  *See* Derivative Action, Dkt. No. 210, *Hewlett-Packard's Memorandum in Support of Preliminary Approval of the Settlement and in Opposition to the Motions to Intervene and Sever*, pp. 19-20.

28.      As such, it is nominal defendant HP's legal position that Autonomy's purported transaction with the Vatican Library—for which Autonomy invoiced and collected funds from MicroTech—never existed and was entirely fraudulent.

29.      MicroTech had no involvement in—or prior knowledge of—any fraud allegedly committed by Autonomy.  The legitimacy of the Vatican Library deal (or any other purportedly fraudulent deal) as between Autonomy and nominal defendant HP is of no moment to MicroTech; MicroTech—through this Action—is simply seeking the return of its money paid to Autonomy for the two deals, set forth above, that never closed.

## V.      CLAIMS ALLEGED

### COUNT ONE

### Breach of Contract—Vatican Library Transaction

### Against Defendant Autonomy

30.      Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

31. The Reseller Agreement and the MicroTech Vatican Library Purchase Order constitute a legally binding contract governing the Vatican Library transaction. Autonomy accepted that contract when it received and retained MicroTech's payments to Autonomy for the Vatican Library deal.

32. MicroTech has substantially performed its obligations regarding the Vatican Library transaction, paying Autonomy $9,221,331.71, with its last payment to Autonomy, of $2.4 million, occurring on or about July 1, 2011. As such, MicroTech brings this Count One within four years, pursuant to Cal. Civ. Code § 337, because—at bottom—the earliest the limitations period could have begun would be the day after the last payment on the contract, or July 2, 2011.

33. Autonomy breached its obligation to MicroTech by failing to close the Vatican Library deal in due course or repay MicroTech on the Vatican Library transaction.

34. MicroTech has been damaged by having paid $9,221,331.71 to Autonomy.

**COUNT TWO**

**Breach of Contract—HP as End-User Transaction**

**Against Defendant Autonomy**

35. Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

36. The Reseller Agreement and the MicroTech HP Purchase Order constitute a legally binding contract governing the HP as End-User transaction. Autonomy accepted that contract when it received and retained MicroTech's payment to Autonomy for the HP as End-User deal.

37. MicroTech has fully performed its obligations regarding the HP as End-User transaction, having paid Autonomy $7.35 million.

38. Autonomy breached its obligation to MicroTech by failing to close the software in due course or repay MicroTech on the HP-End-User transaction.

39. MicroTech has been damaged by having paid $7,350,000 to Autonomy.

**COUNT THREE**

**Unjust Enrichment—Vatican Library Transaction**

**Against Defendant Autonomy**

40.    Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

41.    Given nominal defendant HP's position in the Derivative Action that at least some (and possibly all) of Autonomy's reseller transactions were fraudulent, it necessarily follows that HP believes those fraudulent transactions to be void, *ab initio*.

42.    MicroTech played no part in any fraud purportedly orchestrated by Autonomy, and proffers this Count Three in the alternative to its Breach of Contract (Count One) count.

43.    By virtue of MicroTech paying $9,221,331.71 to Autonomy, with its last payment to Autonomy, of $2.4 million, occurring on or about July 1, 2011 for the Vatican Library transaction—a transaction that may have never existed, but, regardless, never closed, Autonomy has received a material and substantial monetary benefit from MicroTech.  As such, MicroTech brings this Count Three within four years, pursuant to Cal. Civ. Code § 337, because—at bottom—the earliest the limitations period could have begun would be the day after the last payment on the contract, or July 2, 2011.

44.    Autonomy, having failed to provide any goods or services to the Vatican Library with respect to the $9,221,331.71 benefit it received from MicroTech, has unjustly retained and, indeed, been unjustly enriched in the amount of $9,221,331.71, at the expense and to the detriment of MicroTech.

**COUNT FOUR**

**Unjust Enrichment—HP as End-User Transaction**

**Against Defendant Autonomy**

45.    Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

---

46.     Given defendant HP's position in the Derivative Action that at least some (and possibly all) of Autonomy's reseller transactions were fraudulent, it necessarily follows that HP believes those fraudulent transactions to be void, *ab initio*.

47.     MicroTech played no part in any fraud purportedly orchestrated by Autonomy, and proffers this Count Four in the alternative to its Breach of Contract (Count Two) count.

48.     By virtue of MicroTech paying $7.35 million to Autonomy for the HP as End-User transaction, a transaction that may have never existed, but, regardless, never closed, Autonomy has received a material and substantial monetary benefit from MicroTech.

49.     Autonomy, having failed to provide any goods or services to HP (as end-user) with respect to the $7.35 million benefit it received from MicroTech, has unjustly retained and, indeed, been unjustly enriched in the amount of $7.35 million, at the expense and to the detriment of MicroTech.

**Incorporating All COUNTS Against Nominal Defendant**

50.     Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

51.     To the extent that the Nominal Defendant is legally responsible for any of the conduct of Defendants described herein, as a result of nominal defendant HP's acquisition of Autonomy or otherwise, each and every enumerated Count above is brought against the Nominal Defendant to the extent permitted by applicable law.

## VI.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against defendants, as follows:

i)      Awarding compensatory damages in favor of Plaintiff against defendants, jointly and severally, for damages sustained as a result of Autonomy's wrongdoing, in an amount to be proven at trial;

ii)     Awarding Plaintiff pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs, and expenses incurred in prosecuting this Action; and

iii)    Awarding such other relief as the Court may deem just and proper.

COMPLAINT

Case No. 15-cv-2220

# VII.  JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact.

DATED: May 18, 2015

SAVERI & SAVERI, INC.

*/s/ Cadio Zirpoli*
R. Alexander Saveri (173102)
Geoffrey C. Rushing (126910)
Cadio Zirpoli (179108)
Travis L. Manfredi (281779)
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, California  94111
Telephone: 415-217-6810
Facsimile: 415-217-6813
rick@saveri.com
grushing@saveri.com
cadio@saveri.com
travis@saveri.com

Benjamin D. Bianco (*pro hac vice pending*)
**FRANK & BIANCO LLP**
275 Madison Avenue, Suite 705
New York, New York 10016
Telephone:  212-628-1853
Facsimile:  212-682-1892
bbianco@frankandbianco.com

*Counsel for MicroTechnologies, LLC*

# EXHIBIT A

## AUTONOMY GOVERNMENT RESELLER AGREEMENT

This **AUTONOMY GOVERNMENT RESELLER AGREEMENT** is entered into by and between Autonomy, Inc., with offices located at One Market, Spear Tower, 19th Floor, San Francisco, CA 94105 ("Autonomy"), and **MicroTech, LLC,** having its principal place of business at **8330 Boone Boulevard, Vienna, VA 22182** ("Government Reseller").



1. **DEFINITIONS AND CONSTRUCTION**

   1.1 <u>Definitions</u>. In this Agreement and the Exhibits to this Agreement, the terms set forth below shall have the following meaning:

   (1) "Autonomy" shall have the meaning set forth in the initial paragraph hereof.

   (2) "Autonomy Partner Program" shall mean the partnering program managed and administered by Autonomy which sets forth certain obligations of and confers certain benefits upon each Autonomy Government Reseller, as may be determined from time to time by Autonomy in its sole discretion.

   (3) "Autonomy Government Reseller" shall mean any entity that is a member in good standing of the Autonomy Partner Program; for the purposes of this Agreement, reseller shall be considered an Autonomy Government Reseller.

   (4) "Autonomy Products" shall mean the software and associated products and materials specified in Exhibit A.

   (5) "Autonomy Government Reseller Price List" shall mean that schedule of prices for resale of the Autonomy Products, provided from time to time to Government Reseller by Autonomy.

   (6) "Autonomy Trademarks" shall mean the marks, logos and designations of source set forth in Exhibit A.

   (7) "Confidential Information" shall have the meaning set forth in Section 11.

   (8) "Demonstration Copy" shall have the meaning set forth in Section 6.2.

   (9) "Designee" shall mean any entity, appointed by Autonomy, to distribute the Autonomy Products.

   (10) "Effective Date" shall mean **June 29, 2006.**

   (11) "End User" shall mean third party entities for whom Partner provides Services in respect of the Autonomy Products.

   (12) "Enhancement" shall have the meaning set forth in Section 7.1.

   (13) "Error Correction" shall have the meaning set forth in Section 7.1.

   (14) "Fees" shall have the meaning set forth in Section 5.

   (15) "Force Majeure Event" shall have the meaning set forth in Section 14.9.

   (16) "Initial Term" shall have the meaning set forth in Section 10.1.

   (17) "Marketing Assistance Activities" shall have the meaning set forth in Exhibit B.

   (18) "New Release" shall have the meaning set forth in Section 7.1.

   (19) "Promotional Materials" shall have the meaning set forth in Section 3.4.

   (20) "Government Reseller" shall have the meaning set forth in the initial paragraph hereof.

   (21) "Restricted Release" shall have the meaning set forth in Section 7.2.

   (22) "Services" shall mean services provided to an End User by Government Reseller which may include demonstration, pre-sales support, installation, customization, training and such other consulting or integration of or with respect to the Autonomy Products with third party products.

   (23) "Sublicense Fees" shall have the meaning set forth in Section 5.3.

   (24) "Term" shall have the meaning set forth in Section 10.1.

(25)  "Territory" shall have the meaning set forth in Section 3.2.

1.2  References, Headings and Interpretation. In this Agreement and the Exhibits to this Agreement:

(1) the Exhibits to this Agreement shall be incorporated into and deemed part of this Agreement and all references to this Agreement shall include the Exhibits to this Agreement;

(2) references to any law, legislative act, rule or regulation shall mean references to such law, legislative act, rule or regulation in changed or supplemented form or to a newly adopted law, legislative act, rule or regulation replacing a previous law, legislative act, rule or regulation;

(3) references to and mentions of the word "including" or the phrase "e.g." shall mean "including, without limitation";

(4) the Section headings are for reference and convenience only and shall not be considered in the interpretation of this Agreement; and

(5) in the event of a conflict between this Agreement and the terms of any of the Exhibits, the terms of this Agreement shall prevail.

## 2. APPOINTMENT

Autonomy hereby appoints Government Reseller, and Government Reseller hereby accepts such appointment, to act as Autonomy's non-exclusive software reseller of Autonomy Products in the Territory. During the Term, Government Reseller shall act as an independent contractor and neither this Agreement nor the performance of any of its obligations under this Agreement shall be construed to constitute Government Reseller an agent or legal representative of Autonomy or its Designees for any purpose, nor shall this Agreement be deemed to establish a joint venture or partnership.

## 3. OBLIGATIONS OF GOVERNMENT RESELLER

3.1  Performance. Government Reseller shall:

(1) market Autonomy Products and perform Services in accordance with the terms and conditions contained herein

(2) not take any action which may in any way damage the goodwill, name and reputation of Autonomy. In marketing the Autonomy Products, Government Reseller shall not make any representations, warranties, conditions or guarantees concerning the Autonomy Products that are inconsistent with or in addition to those made by Autonomy

(3) staff each of Government Reseller's marketing centers in the Territory with sufficient demonstration equipment and marketing personnel trained in the features and functionality of the Autonomy Products in order to capably demonstrate the Autonomy Products and respond to End User inquiries.

3.2  Territory and Customers. The Autonomy Products may be distributed in the geographic area(s) ("Territory") indicated below;

• Federal Government customers, or mutually agreed upon commercial customers

Except as otherwise provided in this Agreement, Government Reseller shall assume all responsibility and liability to its customers (each a "Customer" and, collectively, "Customers") with respect to the Autonomy Products. Government Reseller shall require each Customer to enter into a license agreement between Government Reseller and each Customer substantially in the form set forth in Exhibit C.

3.3  Sales Outside the Territory; Conflicts. Government Reseller shall not (a) seek Customers for the Autonomy Products outside the Territory or (b) establish or maintain a distribution facility or a distribution branch outside the Territory for the Autonomy Products. Government Reseller shall not supply Autonomy Products to any person who shall or is likely to distribute Autonomy Products outside the Territory. Autonomy reserves the right to sell the Autonomy Products directly to customers in the Territory.

3.4  Advertising and Promotion. With respect to the advertising and promotion of the Autonomy Products:

(1) Government Reseller shall use its best efforts to create a demand for the Autonomy Products in the Territory;

(2) the parties shall discuss from time to time Government Reseller's promotional and advertising plans for the Autonomy Products. Autonomy may supply such promotional and advertising materials ("Promotional Materials") to Government Reseller for inclusion in Government Reseller's own promotional and advertising materials for the Autonomy Products;

(3) if Government Reseller wishes to produce its own Promotional materials in connection with the Autonomy Products, Government Reseller shall submit specimens of such Promotional Materials for Autonomy's prior approval;

(4) Government Reseller shall not publish, issue or display or authorize the publication, issuance or display of any advertisement or promotional materials relating to the Autonomy Products without Autonomy's prior approval;

(5) Government Reseller shall make no product claims of any kind under any circumstance with respect to the Autonomy Products without consultation with, and the prior approval of, Autonomy; and

(6) Government Reseller shall undertake and pay all costs associated with Government Reseller's advertising and promotional activity for the Autonomy Products in the Territory and shall pay for all such activity.

3.5   Expenses.  Except as otherwise provided in this Agreement, Government Reseller shall bear the entire cost and expense of the performance its obligations under this Agreement, including bad debt expenses, inventory losses, Autonomy Product returns, commissions, and taxes.

3.6   Sales to End Users.  (a) Except as otherwise provided in this Agreement, Government Reseller shall assume all responsibility and liability to its customers with respect to the Autonomy Products. (b) Government Reseller shall require each customer to enter into a standard software license agreement with Government Reseller containing terms no less restrictive that those set forth in Exhibit C.

## 4.  OBLIGATIONS OF AUTONOMY

4.1   Initial Delivery.  Autonomy or its Designee shall deliver to Government Reseller one copy of the Autonomy Products in object code format within 10 days after the Effective Date. If Government Reseller requires additional copies of the Autonomy Products for demonstration, training or development purposes, Government Reseller may make additional copies. Autonomy shall make available to Government Reseller, at Autonomy's standard pricing, reasonable quantities of Autonomy's sales and technical brochures.

4.2   Training.  Autonomy shall make available for a fee, training courses to Government Reseller on Autonomy Products (as such training courses are defined in the then current Autonomy Partner Program).

4.3   Support.  Autonomy shall provide support and maintenance as follows:

(1) With respect to Government Reseller, provided Government Reseller is current in its payment of the Fees, Autonomy shall provide such support and maintenance services for the Autonomy Products in accordance with its then-current support service policies.

(2) With respect to End Users, all support of Autonomy Products to End Users shall be provided by Autonomy in accordance with its then-current support service policies and procedures. Support and maintenance of End Users shall be invoiced and administered in accordance with Autonomy's then-current support and maintenance billing policies.

## 5.  ORDERS, FEES AND PAYMENT

5.1   Orders.  Government Reseller shall submit a written purchase order setting forth the information in Exhibit E hereto from Government Reseller for Autonomy Products. Autonomy has the right to reject any purchase order issued hereunder. Once the Autonomy Products on a purchase order has been shipped by Autonomy, Government Reseller may not cancel or amend the purchase order without the prior written consent of Autonomy. This Agreement supersedes any preprinted terms and conditions that may appear on any purchase order relating to the Software. Autonomy Products ordered pursuant to Government Reseller's written purchase orders shall be shipped by means and on media agreed between the parties, and in the absence of agreement otherwise shall be FTP download or if physical then FOB Point of Origin. Autonomy may at its discretion make any New Releases and Error Corrections available for downloading by Government Reseller from Autonomy's

web site. Autonomy shall not be liable for any delay in delivery or failure to give such notice of delay. Government Reseller shall bear all expenses of physical shipment.

5.2   Resale Price. Autonomy shall have the right to set for Government Reseller the resale pricing of any of the Autonomy Products. Government Reseller agrees to meet with Autonomy from time to time as requested by Autonomy to discuss pricing, sales and other business policies and practices relating to the Autonomy Products

5.3   Fees. Government Reseller agrees to pay Autonomy a fee for Autonomy Products distributed to an End User pursuant to a sublicense Agreement which is equal to the percentage of Autonomy's list price for such Autonomy Products specified in the Sublicense Fee Schedule attached hereto as Exhibit B ("Sublicense Fees"). All of the Autonomy Products purchased by Government Reseller from Autonomy or its Designee shall be sold to Government Reseller at the prices and on the terms and conditions of sales set forth in the then current Autonomy Government Reseller Price List, or at such other prices, terms and conditions established by Autonomy or its Designee. Subject to this Section, Autonomy reserves the right to change its prices, terms and conditions at any time prior to acceptance of an order.

5.4   Government Reseller Program Fees. In consideration of Government Reseller's annual payment to Autonomy of the Government Reseller program fees specified in Exhibit B, Government Reseller shall be entitled to:

(1) membership in the Autonomy Partner Program;

(2) Autonomy support services;

(3) purchase Autonomy training classes to be held at Autonomy training facilities for the prices specified in the price list, less the discount percentage specified in Exhibit B. The Government Reseller program fees shall be invoiced annually by Autonomy and shall be due within 30 days after the date of such invoice. Government Reseller's failure to pay such fees may result in termination of this Agreement subject to the applicable terms and conditions of Section 10.

5.5   Payment. Upon receipt of an order for the Autonomy Products, Autonomy shall deliver an invoice to Government Reseller indicating the amount owed for the Autonomy Products. The charges set forth in such invoice shall be due and payable to Autonomy within 30 days of the date of Autonomy's invoice. Government Reseller shall not be relieved of its obligations to pay fees owed to Autonomy hereunder by the nonpayment of such fees by an End User. Payments that are overdue shall accrue interest at the rate of one and one-half percent per month or the maximum rate permitted by law, whichever is lower. If applicable, Government Reseller shall furnish Autonomy with appropriate tax exemption certificates, and shall be responsible for timely payment of all taxes (including without limitation, sales, value added and withholding taxes), fees import and export fees and duties arising from the performance by the parties of the terms of this Agreement, other than taxes based upon the net income of Autonomy.

5.6   Reports and Audits.

(1) Government Reseller shall furnish to Autonomy, at Autonomy's request, such periodic forecasts, budgets, promotional schedules, and recommendations for marketing and sales the Territory as Autonomy may request;

(2) Government Reseller shall keep true and accurate records applicable to an order adequate to verify fee payments to be made for a period of three years following date of Government Reseller's payment for such order;

(3)  Autonomy and its Designees may inspect all relevant accounts and records of Government Reseller relating to (a) sales of the Autonomy Products or charges made by Government Reseller against Autonomy and (b) all facilities of Government Reseller in which Government Reseller performs its obligations under this Agreement.

6.   LICENSE

6.1   Grant of License to Resell Autonomy Products. Autonomy hereby grants to Government Reseller, during the term of this Agreement, a limited, nonexclusive, non-transferable right and license to use and reproduce copies of the Autonomy Products, in object code form only, for the purposes of promotion, resale, distribution, technical support and maintenance of the Autonomy Products to Customers pursuant to the terms of this Agreement.

6.2 <u>Grant of License for Demonstration, Training and Project Development</u>. Autonomy hereby grants to Government Reseller, at no additional charge, a non-exclusive, non-transferable license to use an unlimited number of copies of the Autonomy Products, except those that contain third parties' royalty bearing technology, solely for (a) demonstrating the Autonomy Products on Government Reseller's premises or at trade shows or seminars; (b) providing training on Government Reseller's premises, (c) demonstrating the Autonomy Products at a prospective End User's site; (d) for the development of Government Reseller's internal expertise of Autonomy Technology and (e) for the development, testing and support of Government Reseller's delivery of Services to End Users.

6.3 <u>License Exclusions</u>. Government Reseller may use the Autonomy Products only to the extent expressly authorized or licensed under this Agreement. No other rights to Autonomy Products are granted by Autonomy to Government Reseller, or may be granted by Government Reseller to any third party. Specifically, but not by way of limitation, Government Reseller shall not:

(1) appoint third parties to market, sublicense or otherwise distribute the Autonomy Products, and neither Government Reseller nor any of its employees, agents or representatives may manufacture, reproduce or sublicense (except as otherwise expressly permitted herein) the Autonomy Products, or distribute derivative works of the Autonomy Products;

(2) modify, change, decompile, disassemble, reverse compile or reverse engineer the Autonomy Products without Autonomy's prior consent and Government Reseller shall expressly prohibit its employees, agents or representatives from same;

(3) rent, electronically distribute or timeshare the Autonomy Products or market the Autonomy Products by interactive cable or remote processing services;

(4) use the Autonomy Products provided to Government Reseller hereunder in any way for its own internal business purposes;

(5) use the Autonomy Products for the purposes of conducting comparative analysis, evaluations or product benchmarks without Autonomy's prior written approval; or

(6) provide the Autonomy Products (including any technology solution of Government Reseller which contains any Autonomy product or any portion thereof) to any person or entity other than a licensed End User of the Autonomy Products.

## 7. ENHANCEMENTS AND NEW RELEASES

7.1 <u>Enhancements and New Releases</u>. Autonomy may provide Enhancements or New Releases to Government Reseller for inclusion in, or as replacements for, the Autonomy Products. Upon the delivery of any such Enhancements or New Releases to Government Reseller by Autonomy or a Designee, each such Enhancement or New Release shall become part of, or replace the applicable Autonomy Products for purposes of this Agreement. For the purposes of this Agreement:

(1) "<u>Enhancement</u>" shall mean a change or addition to the Autonomy Products, other than an Error Correction or a New Release, that (a) improves the function of, (b) adds a new function to or (c) substantially enhances the performance of an Autonomy Product; provided that Enhancements shall not include any improvements or new functions, in any form, that have a value or utility separate from the use of the Autonomy Products and that may be priced and offered separately from the Autonomy Products;

(2) "<u>Error Correction</u>" shall mean a change to each Autonomy Product that allows each such Autonomy Product to reestablish material conformity with the specifications for each such Autonomy Product. All Error Corrections shall be considered part of the Autonomy Products for all purposes under this Agreement; and

(3) "<u>New Release</u>" shall mean any revision of the Autonomy Products, other than an Enhancement or an Error Correction, for which the version or revision number of such Autonomy Product is increased by a whole number.

7.2 <u>Restricted Release</u>. "<u>Restricted Release</u>" shall mean any version of the Autonomy Products marked as alpha, beta or otherwise designated as a Restricted Release. If Government Reseller participates in a Restricted Release program:

(1) Government Reseller shall promptly report to Autonomy any error condition discovered in the Restricted Release;

(2) Autonomy shall have no obligation to correct errors or deliver updates to the Restricted Release;

(3) Autonomy shall have no obligation otherwise support the Restricted Release;

(4) Government Reseller shall provide Autonomy with appropriate test data for the Restricted Release if necessary to resolve problems in the Restricted Release encountered by Government Reseller;

(5) the Restricted Release is experimental, may contain problems and errors and is being provide to Government Reseller on an as-is basis with no warranty of any kind, express or implied;

(6) neither party shall be responsible or liable to the other for any losses, claims or damages of whatever nature, arising out of or in connection with the performance or nonperformance of the Restricted Release;

(7) Government Reseller's use of the Restricted Release is for testing purposes only and shall not be related in any way to production applications or to Government Reseller's delivery of Services to an End User; and

(8) Government Reseller shall not distribute the Restricted Release to third parties without the prior written consent of Autonomy.

## 8. PROPRIETARY RIGHTS

8.1   Proprietary Markings. With respect to Autonomy's proprietary markings:

(1) Government Reseller shall have no rights under this Agreement in or to the Autonomy Trademarks, and shall not during the Term, represent that it is the owner or licensee of the Autonomy Trademarks;

(2) Government Reseller shall not dispute the validity of the Autonomy Trademarks;

(3) Government Reseller agrees to use the Autonomy Trademarks in advertisements, letterheads or otherwise only as may be approved in advance in writing by Autonomy;

(4) All Autonomy Products shall be sold only with labeling and packaging whose format and type have been supplied or approved by Autonomy.   All Autonomy Products shall be sold or promoted by Government Reseller only under Trademarks specified or approved by Autonomy. Government Reseller shall not at any time register, or cause to be registered, in its name or in the name of any other person, or use or employ during or after the Term, any of the Autonomy Trademarks or any trademark, name or design resembling or similar to any of the Autonomy Trademarks; and

(5) Government Reseller agrees that (a) it shall not use trademarks, service marks, tradenames, logos or designs confusingly similar to the Autonomy Trademarks and (b) upon termination or expiration of this Agreement, it shall discontinue all use of the Autonomy Trademarks and shall not thereafter advertise, promote, resell, distribute or otherwise deal in any products bearing the Autonomy Trademarks.   For the purposes of this Agreement, "Trademarks" shall mean the trademarks, service marks, tradenames, logos and designs associated with the Autonomy Products and the Autonomy Partner Program, whether registered or unregistered, including those listed on Exhibit B.

8.2   Infringement. Government Reseller shall report to Autonomy any actual or suspected infringement or imitation of the Autonomy Trademarks or the Autonomy Products of which it has knowledge, and shall assist Autonomy in protecting its rights in and to the Autonomy Trademarks and the Autonomy Products; provided that Government Reseller shall not initiate any action with respect to the Autonomy Trademarks or the Autonomy Products without Autonomy's prior approval.

8.3   No License. No license, express or implied, other than that which is set forth in Section 6, is granted under this Agreement by Autonomy or its Designees to or under any of Autonomy's or its Designees' copyrights, trademarks, patents or other intellectual property or related intellectual property rights.

8.4   Goodwill. Government Reseller shall use its best efforts to preserve and enhance the goodwill of the Autonomy Products and the Autonomy Trademarks.   All goodwill associated with the Autonomy Products, the Autonomy Trademarks and the Autonomy Partner program shall inure to the benefit of Autonomy.

## 9. REPRESENTATIONS AND WARRANTIES

9.1   By Autonomy. Autonomy represents and warrants that:

(1) it has the right to license the Autonomy Products to Government Reseller; and

(2) that for a period of ninety (90) days from the date of shipment of the Autonomy Products to Government Reseller or End User  pursuant to this Agreement, the Autonomy Products, unless

modified by other than Autonomy, shall perform in all material respects with the technical specifications provided by Autonomy for the Autonomy Products where the Autonomy Products are loaded onto suitably configured equipment and set up to process data in accordance with the technical specifications for the Autonomy Products..

9.2 **DISCLAIMER. EXCEPT AS SPECIFIED IN SECTION 9.1 AUTONOMY MAKES NO OTHER WARRANTIES WITH RESPECT TO THE AUTONOMY PRODUCTS AND AUTONOMY EXPLICITLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A SPECIFIC PURPOSE.**

9.3 Warranty Claims. Government Reseller shall promptly notify Autonomy of any likelihood of a claim under Autonomy's warranty as set forth in Section 9.1.

## 10. TERM AND TERMINATION

10.1 Term. The initial term of this Agreement shall commence on the Effective Date and continue for one year, or such earlier date upon which this Agreement may be terminated pursuant to Article 10 (the "Initial Term"). Unless

(1) this Agreement is terminated earlier pursuant to Section 10.5; or

(2) Autonomy notifies Government Reseller pursuant to this Section at least 60 days prior to the end of the Initial Term that Autonomy does not desire to renew this Agreement, this Agreement shall automatically renew for a period of one year (the Initial Term and each such subsequent one-year period, collectively, the "Term").

10.2 Termination by Autonomy. Autonomy may terminate this Agreement upon notice to the Government Reseller in the event that:

(1) Government Reseller attempts to assign this Agreement without the consent of Autonomy;

(2) Government Reseller materially breaches any of its obligations pursuant to this Agreement;

(3) Government Reseller is unable to pay its debts when due; or

(4) there is a direct or indirect change in ownership or control or corporate reorganization of Government Reseller.

10.3 Termination by Either Party. Either party may terminate this Agreement upon notice to the other party in the event that:

(1) the other party makes an assignment for the benefit of such party's creditors;

(2) the other party admits its insolvency;

(3) voluntary or involuntary proceedings are instituted by or against the other party in bankruptcy or for a receivership, winding-up, dissolution or reorganization of such party; or

(4) the other party takes any action under an act for relief from creditors.

10.4 Termination for Default. If either party defaults in the performance of any of its material obligations (or repeatedly defaults in the performance of any of its other obligations) under this Agreement and does not cure such default within 10 days of receipt of a notice of default, then the non-defaulting party may, by giving notice to the defaulting party, terminate this Agreement as of the termination date specified in the notice.

10.5 Termination for Convenience. Either party may terminate this Agreement upon 90 days' prior notice to the other party.

10.6 Effect of Termination or Expiration. Upon termination or expiration of this Agreement:

(1) Government Reseller shall immediately cease (a) the advertising, promotion, resale and distribution of the Autonomy Products and (b) using any of the Autonomy logos including the Partner Government Reseller logo and (c) promoting itself as an Autonomy Government Reseller or Government Reseller;

(2) all indebtedness of Government Reseller to Autonomy or its Designee shall become immediately due and payable;

(3) all orders which have not been shipped to Government Reseller as of the date of termination or expiration, even if previously accepted, shall be canceled without liability to either party or any Designee; and

(4) Government Reseller shall return to Autonomy all unused promotional or other materials relating to the sale of the Autonomy Products and any and all other property of Autonomy in the

possession or control of Government Reseller, and Government Reseller shall cancel or transfer to Autonomy or its Designee consents, approvals, authorizations, permits, registrations and licenses of the Autonomy Products in accordance with Autonomy's instructions and applicable law; Each party shall warrant to the other within five  days of termination that all Confidential Information of the other party then in its possession has been destroyed or returned.

10.7 <u>Discontinued Autonomy Products</u>.    This Agreement shall automatically terminate as to any Autonomy Product if:

(1) Autonomy or its Designee ceases to manufacture or sell such Autonomy Product; or

(2) the right to sell or to solicit sales of such Autonomy Product granted to Autonomy or its Designee is terminated.

## 11. CONFIDENTIALITY

All Confidential Information relating to or obtained from a party or, in the case of Autonomy, its Designees, shall be held in confidence by the receiving party to the same extent and in at least the same manner as such party protects its own confidential or proprietary information.  A party or, in the case of Autonomy, its Designees, shall not disclose, publish, release, transfer or otherwise make available Confidential Information of, or obtained from the other party or, in the case of Autonomy, its Designees, in any form to, or for the use or benefit of, any person without the disclosing party's consent.  Except to the extent that any applicable law provides otherwise, the obligations of this Section shall not apply with respect to information that (1) is independently developed by the receiving party without violating the disclosing party's proprietary rights, as shown by the receiving party's written records, (2) is or becomes publicly known (other than through unauthorized disclosure), (3) is disclosed by a party to a third party free of any obligation of confidentiality or (4) is already known by the receiving party at the time of disclosure, as shown by such party's written records, and such party has no obligation of confidentiality other than pursuant to this Agreement or any confidentiality agreements entered into before the Effective Date.  For the purposes of this Agreement, "Confidential Information" shall mean all information and documentation of a party and, in the case of Autonomy, its Designees, whether disclosed to or accessed by the other party in connection with this Agreement, including (1) all information of a party and, in the case of Autonomy, its Designees, or such party's customers, suppliers, contractors and other third parties doing business with such party, and any other information of such party or, in the case of Autonomy, its Designees, or such party's customers, suppliers, contractors and other third parties doing business with such party that is not permitted to be disclosed to third parties under local laws or regulations, (2) information relating to a party's (or, in the case of Autonomy, its Designees') customers, employees, technology, operations, facilities, consumer markets, products, capacities, systems, procedures, security practices, research, development, business affairs and finances, ideas, concepts, innovations, inventions, designs, business methodologies, improvements, trade secrets, copyrightable subject matter, patents and other intellectual property and proprietary information, (3) the terms of this Agreement and (4) any information developed by a party by reference to the other party's (or in the case of Autonomy, its Designees') information.

## 12. INDEMNIFICATION

12.1 <u>Indemnity by Autonomy</u>.    Autonomy shall indemnify Government Reseller from, and defend Government Reseller against, any damages, losses, liability (including settlements and judgments) or expenses (including attorneys' fees and expenses) arising out of or relating to any claim relating to any inherent or patent defect in any of the Autonomy Products manufactured and packaged by Autonomy and sold by Government Reseller pursuant to this Agreement.

12.2 <u>Indemnity by Government Reseller</u>.    Government Reseller shall indemnify Autonomy and its Designees from, and defend Autonomy and its Designees against, any damages, losses, liability (including settlements and judgments) or expenses (including attorneys' fees and expenses) arising out of or relating to any claim relating to Government Reseller's advertising, promotion, resale, distribution, storage or transportation of the Autonomy Products.

## 13. DAMAGES AND LIMITATION OF LIABILITY

13.1 <u>Damages.</u> In the event of any claim relating to the Autonomy Products, Autonomy's sole liability to Government Reseller for any such claim, and Government Reseller's sole remedy in respect of such claim, shall be replacement of the Autonomy Products.

13.2 <u>LIMITATION OF LIABILITY.</u> **AUTONOMY SHALL NOT BE LIABLE FOR, NOR SHALL THE MEASURE OF DAMAGES UNDER ANY THEORY OF LIABILITY, WHETHER IN CONTRACT, TORT STRICT LIABILITY OR OTHERWISE, INCLUDE, ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOSS OF PROFITS OR LOSS OF BUSINESS) ARISING OUT OF OR RELATING TO ITS PERFORMANCE OR FAILURE TO PERFORM UNDER THIS AGREEMENT.**

## 14. MISCELLANEOUS PROVISIONS.

14.1 <u>Assignment.</u> Government Reseller shall not, without the consent of Autonomy, assign this Agreement or any amounts payable pursuant to this Agreement. Autonomy's consent to any assignment of this Agreement shall not constitute Autonomy's consent to further assignment. This Agreement shall be binding on the parties and their respective successors and permitted assigns. Any assignment in contravention of this subsection shall be void.

14.2 <u>Notices.</u> All notices, requests, consents, approvals and other communications required or permitted under this Agreement shall be in writing and shall be deemed given when delivered to a party by registered or certified mail or equivalent means of delivery, or when sent by telecopy.

14.3 <u>Counterparts, Severability and Waivers.</u> This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one single agreement between the parties. If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, then the remaining provisions of this Agreement, if capable of substantial performance, shall remain in full force and effect. No delay or omission by either party to exercise any right or power it has under this Agreement shall impair or be construed as a waiver of such right or power. A waiver by any party of any breach or covenant shall not be construed to be a waiver of any succeeding breach or any other covenant. All waivers must be signed by the party waiving its rights.

14.4 <u>Amendments.</u> No amendment to, or change, waiver or discharge of, any provision of this Agreement shall be valid unless in writing and signed by an authorized representative of each of the parties.

14.5 <u>Survival.</u> The terms of Section 1, Section 8, Section 10.6, Section 11, Section 13, Section 14.2, this Section, Section 14.6, and Section 14.7 shall survive the termination or expiration of this Agreement.

14.6 <u>Governing Law.</u> This Agreement and the rights and obligations of the parties under this Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to the principles thereof relating to the conflicts of laws.

14.7 <u>Sole and Exclusive Venue.</u> Each party irrevocably agrees that any legal action, suit or proceeding brought by it in any way arising out of this Agreement must be brought solely and exclusively in the United States District Court for the Northern District of California or in the state courts of the State of California and irrevocably accepts and submits to the sole and exclusive jurisdiction of each of the aforesaid courts in personam, generally and unconditionally with respect to any action, suit or proceeding brought by it or against it by the other party.

14.8 <u>Covenant of Further Assurances.</u> Autonomy and Government Reseller covenant and agree that, subsequent to the execution and delivery of this Agreement and, without any additional consideration, each of Autonomy and Government Reseller shall execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.

14.9 <u>Force Majeure.</u> If and to the extent a party's performance of any of its obligations pursuant to this Agreement is prevented, hindered or delayed by fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, or any other similar cause beyond the reasonable control of such party (each, a "Force Majeure Event"), and such non-performance, hindrance or delay could not have been prevented by reasonable precautions, then the non-performing, hindered or delayed party shall be excused for such non-performance, hindrance or delay, as applicable, of those obligations affected by the Force Majeure Event for as long as such Force Majeure Event continues and such party continues to use its best efforts to recommence performance whenever and to whatever extent possible without delay, including

through the use of alternate sources, workaround plans or other means. The party whose performance is prevented, hindered or delayed by a Force Majeure Event shall immediately notify the other party of the occurrence of the Force Majeure Event and describe in reasonable detail the nature of the Force Majeure Event.

14.10 Entire Agreement. This Agreement and the Exhibits to this Agreement represent the entire agreement between the parties with respect to its subject matter, and there are no other representations, understandings or agreements between the parties relative to such subject matter.

AUTONOMY, INC

By: _____

Name: _____ Frak Bo _____

Title: _____ COO _____

Date: ___ June 30, 2006 ____

MICROTECH, LLC

By: _____

Name: _ Anthony R. Jimenez ___

Title: President and CEO _____

Date: _ 6/30/06 _____

## EXHIBIT A
### To the Autonomy Government Reseller Agreement

#### SECTION 1:  AUTONOMY PRODUCTS

Item

| |
|---|
| A list of Authorized Products and Reseller price is provided as a separate sheet and is updated solely at Autonomy's discretion |

#### SECTION 2:  OTHER TERRITORY OR TERRITORIES

Other Territory or Territories

| |
|---|
| NONE |

#### SECTION 3:  AUTONOMY TRADEMARKS



- Autonomy
- VIRAGE
- Autonomy, Inc.®, Virage, Inc.® and
- those product names as marked in this Exhibit A.

## EXHIBIT B

### To the Autonomy Government Reseller Agreement

## SECTION 1: AUTONOMY PARTNER PROGRAM FEES

- The Initial Term Autonomy Advantage Program Fee of US $10,000.00 is waived, provided that Government Reseller pays Autonomy at least US $50,000.00 related to orders hereunder within 6 months of the Effective Date.

- If this Agreement is renewed for additional annual Terms, the annual Autonomy Advantage Program Fee will be reviewed based on the previous year's performance activities.

## SECTION 2: SUBLICENSE FEES

- Government Reseller shall pay a sublicense fee equal to 90% of the prices listed in the then current Government Reseller Price List.

## SECTION 3: MARKETING ASSISTANCE ACTIVITIES

An Autonomy Partner ideally must perform at least one marketing activity and a minimum of two sales assistance activities from the lists below to maintain "member in good standing" within the Autonomy Partner Program:

Marketing Activities:

1. Introduce Autonomy into an account to which Partner is providing Services or is contractually engaged to provide Services and which has not been identified by Autonomy as either an existing Autonomy account or an account which Autonomy is actively pursuing.

2. Introduce Autonomy into a new business Application opportunity within an existing Autonomy account to which Partner is providing Services as specified above and which has not been identified by Autonomy as an opportunity which Autonomy is then actively pursuing.

3. Act, upon Autonomy's request, as the primary sales interface to an account where Autonomy has introduced and positioned the Partner to the account.

Sales Assistance Activities:

1. Determine the End User requirements and provide demonstrations of Autonomy products, when applicable;

2. Respond to Prospects' RFIs or RFPs as they pertain to the Autonomy products;

3. Advise Autonomy of planned installation dates and any dependencies;

4. Advise the End User or Prospect regarding installation responsibilities and assist in developing and implementing related plans (including education) and progress reviews.

5. Be the primary contact for Autonomy product information, and technical and operational advice associated with the solution delivered. Such advice may include systems management, capacity planning, and problem solving;

6. On Autonomy's request:

(a) participate in configuration and systems assurance reviews.

(b) assist in problem identification and resolution.

## EXHIBIT C

### To the Autonomy Government Reseller Agreement

IMPORTANT! READ CAREFULLY! This is a legal agreement between you (either an individual or an entity) ("Licensee") and Autonomy, Inc., with offices at One Market, Spear Tower, 19th Floor, San Francisco, CA 94105 ("Autonomy"), for the license of the Autonomy software product(s) enclosed and/or identified herein, which includes the Autonomy's software and associated media and printed materials, and may include "online" or electronic documentation (the "Licensed Materials."). BY OPENING THE SEALED SOFTWARE PACKAGE LICENSEE AGREES TO BE BOUND BY THE TERMS OF THIS AGREEMENT (WHICH INCLUDES THE TERMS OF ANY SCHEDULE). If Licensee does not agree to the terms of this Agreement, Licensee must not use the program and must promptly return it to Autonomy or the Autonomy authorized reseller from whom Licensee obtained it (each a "Licensor") for a full refund.

1. LICENSE GRANT. Subject to the terms of this Agreement (including those of a Schedule executed by both Licensor and Licensee), and subject to Licensee's payment of the appropriate license and other fees specified on the relevant Schedule, Autonomy grants to Licensee a personal, non-transferable, non-sublicensable license to use the Licensed Materials. Licensee may use the software portion of the Licensed Materials on only the number of computers (and/or CPUs) within the other license restrictions as specified on the relevant Schedule at any time, which use may include loading the permitted number of copies of the software into the temporary memory (i.e. RAM) or installing the software into the permanent memory (e.g., hard disk) of a computer, or using a number of copies of the software equal to the number of users as set forth on the relevant Schedule at any time. If a specific number of CPUs, computers and/or users are not specified on the Schedule, Licensee may use only one copy of the Licensed Materials on one computer with one user. Licensee may also make one copy of the Licensed Materials for backup purposes.

2. OWNERSHIP. The Licensed Materials and any copies thereof, including all updates, enhancements and modifications thereto, are licensed and not sold and shall remain the property of Autonomy. The Licensed Materials are protected by European Union and international copyright, trademark and trade secret laws, as well as certain international treaty provisions.

3. RESTRICTIONS. Notwithstanding any provisions in this agreement to the contrary, Licensee may not (a) make, use or load into temporary memory any unapproved copies of the Licensed Materials; (b) distribute the Licensed Materials; (c) modify, transmit, rent, lease or sublicense the Licensed Materials or use the Licensed Materials for service bureau purposes; (d) reverse-engineer, decompile or disassemble the Licensed Materials, except to the extent required to be permitted by applicable law; (e) disclose any source core or performance characteristics of the Licensed Materials to any person or entity; or (f) at any time do or permit to be done anything which shall adversely affect Autonomy's right, title or interest in the Licensed Materials. If the Licensed Materials are used within a country of the European Community, nothing in this Agreement shall be construed as restricting any rights available under the EC Council Directive 14 May 1991 on the legal protection of computer programs. Other restrictions may be specified on the Schedules.

4. PAYMENT. Licensee agrees to pay to Licensor the fees specified on the relevant Schedule upon the terms set forth thereon.

5. NEW RELEASES. From time to time Autonomy may, in its sole discretion, issue new releases of the software portion of the Licensed Materials, such as fixes, patches, maintenance releases and workarounds ("Updates"), which shall be provided free of charge as they become available for the period of this Agreement providing that Licensee has paid the then applicable Support Fee specified in the Schedules. If Licensee receives an Update, this Agreement will apply to both the original release of the Licensed Materials and the Update. For the avoidance of doubt Updates do not include any Autonomy software deemed by Autonomy to contain significantly enhanced features and/or capabilities or any new products.

6. SUPPORT. Provided Licensee has paid the Support Fee set forth in the Schedules, all support shall be provided as set forth therein.

7. TERM AND TERMINATION. (a) This Agreement shall begin and expire on the dates as set out in the Schedules. (b) Notwithstanding the provisions of clause 7(a), this Agreement may be terminated forthwith by either party upon giving written notice to the other if the other: (i) commits any material breach of this Agreement which (in the case of a breach capable of remedy) shall not have been remedied to the reasonable satisfaction of the non-breaching party within 30 days after receipt by the breaching party of a notice of such breach; or (ii) shall (A) cease conducting business in the normal course, (B) commits an act of bankruptcy, (C) is adjudicated bankrupt, (D) enters into liquidation, whether compulsory or voluntary (other than for the purposes of amalgamation or reconstruction), (E) compounds with its creditors generally, (F) has a receiver, administrator, administrative receiver, liquidator or manager appointed over all or any of its assets, (G) suffers execution or distress, (H) becomes unable to pay its debts as they fall due or (I) takes or suffers any similar action in consequence of debt. (c) Upon termination of this License, Licensee will immediately cease all use of the Licensed Materials. Within five days after termination, Licensee will return to Licensor, or destroy at Licensor's request, all copies of the Licensed Materials (in any form or media) and provide written confirmation of such to Licensor.

8. LIMITED WARRANTY. (a) Autonomy warrants, for Licensee's benefit alone, that for a period of 90 days after receipt by Licensee (i) the software portion of the Licensed Materials will perform substantially in accordance with Autonomy's standard data sheets (attached to the Schedules); and (ii) the medium upon which the software portion of the Licensed Materials is provided shall be free from defects in material and workmanship under normal use. This warranty covers only problems reported to Autonomy during the aforesaid warranty period.

9. DISCLAIMER. To the fullest extent permitted by applicable law, Autonomy disclaims any and all other warranties, either express or implied, including, but not limited to, with respect to the Licensed Materials, implied warranties of quality and fitness for a particular purpose. Autonomy does not warrant that the software portion of the Licensed Materials or the functions contained in the Licensed Materials will meet Licensee's requirements, operate without interruption or be error free.

10. LICENSEE REMEDIES. EXCEPT IN THE EVENT OF PERSONAL INJURY OR DEATH AS A RESULT OF NEGLIGENCE, LICENSEE'S SOLE AND EXCLUSIVE REMEDY, UNDER ANY WARRANTY OR LEGAL THEORY, SHALL BE LIMITED TO, AT AUTONOMY'S DISCRETION, SUPPORT OR THE REPLACEMENT OF THE LICENSED MATERIALS.

11. LIMITATION OF LIABILITY. EXCEPT IN THE EVENT OF PERSONAL INJURY OR DEATH AS A RESULT OF NEGLIGENCE, IN NO EVENT SHALL AUTONOMY BE LIABLE UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER LEGAL THEORY FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, BUSINESS INTERRUPTION, LOSS OR INACCURACY OF INFORMATION) ARISING OUT OF THE USE OF OR INABILITY TO USE THE LICENSED MATERIALS, EVEN IF THE LOSS WAS REASONABLY FORESEEABLE OR AUTONOMY HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  IN NO EVENT WILL AUTONOMY'S AGGREGATE LIABILITY TO LICENSEE EXCEED THE AMOUNT OF THE LICENSE FEE PAID BY LICENSEE.

12. INTELLECTUAL PROPERTY RIGHTS. (a) Licensee agrees to continually use reasonable efforts to protect Autonomy's proprietary rights and to cooperate at reasonable cost to Autonomy in its efforts to protect Autonomy's proprietary rights.  (b) Licensee agrees to promptly notify Autonomy of any known or suspected infringement or breach of Autonomy's proprietary rights that comes to Licensee's attention. (c) Autonomy shall have the exclusive right to institute infringement or other appropriate legal action against alleged prospective or actual infringers of Autonomy's intellectual and other proprietary rights in the Licensed Materials, and shall incur all expenses in connection with any such legal action and shall retain all money received from such action.  (d) If the Licensed Materials become or, in Autonomy's opinion are reasonably likely to become, the subject of a claim that they infringe the rights of any third party, Licensee will permit Autonomy, at Autonomy's expense either (i) to procure the right for Licensee to continue using the Licensed Materials; or (ii) to replace and modify the Licensed Materials so that they becomes non-infringing, provided, however, if neither of the foregoing alternatives is reasonable, Licensee will return the Licensed Materials to Licensor and Licensor will refund the price paid by Licensee for the returned Licensed Materials whereupon this Agreement shall terminate immediately.  Notwithstanding the foregoing, Autonomy shall not be liable for any such claim that arises as a result of (i) any modification of the Licensed Materials by the Licensee, (ii) use of the Licensed Materials otherwise than in accordance with the documentation provided with the Licensed Materials and (iii) use of a superseded release of Licensed Materials if the infringement would have been avoided by the timely implementation of an Update supplied by Autonomy.

13. LICENSEE INDEMNITIES. Licensee will indemnify and hold Autonomy harmless from all actual liabilities, damages and losses incurred by Autonomy (including all costs and expenses, including attorneys' fees) ("Losses") to the extent arising out of any legal action based on any claim by a third party that Autonomy, due to Licensee's use of the Licensed Materials, is liable for contributory infringement of a copyright, patent, trade secret or other proprietary right of a third party, provided that this indemnity will not apply to any claim to the extent the Licensed Materials as delivered by Autonomy infringes on a proprietary right of a third party.  In addition, Licensee shall indemnify and hold Autonomy harmless from all Losses to the extent arising out of any legal action based on any claim by a third party that Autonomy, due to Licensee's use of the Licensed Materials, is liable to a third party in tort or under statutory liability for defamation, invasion of privacy or similar theories of law. Licensee agrees to comply with all laws relating to Licensee's use of the Licensed Materials and to indemnify and hold Autonomy harmless from all Losses to the extent arising out of any acts or omissions of Licensee that break any law and involve Licensee's use of the Licensed Materials.

14. MARKETING, PUBLICITY AND BRANDING.  Licensee shall reasonably assist Autonomy in the creation and (where applicable) distribution of marketing and publicity-related materials in respect of the subject matter of this Agreement (such as press releases and case studies; collectively "Releases").  No Release shall be made public unless and until the parties agree as to the content of such Release.  At Autonomy's reasonable request, Licensee agrees to prominently place the Autonomy brand logo or equivalent material (e.g., "Powered by Autonomy") on Licensee's World Wide Web site, intranet or equivalent site, as applicable, in reasonable proximity to any area thereof which provides functionality related to Licensee's use of the Software.  Licensee's use of such trade marks and logos will be in accordance with Autonomy's policies in effect from time to time as notified to Licensee.

15. GOVERNMENT USE.  If Licensee is a unit or agency of the Government, or acquiring the Licensed Materials with government funds, the Licensed Materials are provided subject to Autonomy's standard commercial license; provided, however, that any contracts with non-defense agencies subject to the FAR, the Government shall have the rights set forth in subparagraph (c) of FAR 52.227-19, "Commercial Computer Software-Restricted Rights," as applicable.

16. MISCELLANEOUS.  This Agreement and the Schedules is the complete and exclusive statement of the mutual understanding of the parties and supersedes any other Agreement or preprinted terms and conditions relating to the Licensed Materials.  Neither the rights nor the obligations arising under this Agreement are assignable or transferable by Licensee without the prior written consent of Autonomy, and any such attempted assignment or transfer shall be void and without effect.  This Agreement shall be governed pursuant to the laws of the State of California and the United States without regard to the conflict of laws provisions thereof.  The waiver by either party of a breach of this Agreement or any right hereunder shall not constitute a waiver of any subsequent breach of this Agreement; nor shall any delay by either party to exercise any right under this Agreement operate as a waiver of any such right.  If any provision of this Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.  The parties agree that a material breach of this Agreement adversely affecting Autonomy's proprietary rights in the Licensed Materials would cause irreparable injury to Autonomy for which monetary damages would not be an adequate remedy and that Autonomy shall be entitled to equitable relief in addition to any remedies it may have hereunder or at law.  Section 2 (Ownership); Section 3 (Restrictions); Section 4 (Fees); Section 7 (Term); Section 9 (Disclaimer); Section 11 (Limitation of Liability), Section 13 (Licensee Indemnities) and this Section 22 shall survive termination or expiration of this Agreement.

**EXHIBIT C continued**
To the Autonomy Government Reseller Agreement

**ATTACHMENT A TO SAMPLE OF STANDARD SOFTWARE LICENSE AGREEEMENT**

1. **Software:**

2. **Fees:**

   License: $ _____

   Maintenance: $ _____

   Other: $ _____

3. **Payment Terms:**

4. **Authorized Platform(s):**

5. **Other**

## EXHIBIT D
### To the Autonomy Government Reseller Agreement

### Marketing Activities Lead Notification Tracking Form

Date _____

**Partner Information:**

Partner Name: _____

Partner Contact: _____    Partner Telephone: _____

Partner Address: _____    Partner FAX: _____

**Customer Information:**

Customer: _____ Customer Contact: _____

Customer Address: _____

Customer Telephone: _____

**Project Information:**

Is this customer an existing Autonomy User?    _____ Yes    _____ No

Briefly describe the customer's business Application: _____

_____

_____

What Partner Activities that benefit Autonomy have occurred?

| Marketing/Sales Activities | Customers in Attendance | Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**Signatures**

Partner Representative: _____    Date_____
Local Autonomy Account Manager/Sales Director:_____    Date_____
Autonomy Director of Channel Sales: _____    Date_____

**For Autonomy Sales Account Manager Use Only:**

Net License Fees to Autonomy:    $_____

**EXHIBIT E**

To the Autonomy Government Reseller Agreement

## FORM OF PURCHASE ORDER

**PURCHASE ORDER**
[DATE]

From : [GOVERNMENT RESELLER]
      [ADDRESS]

To:   Autonomy, Inc.
      One Market, Spear Tower, 19th Floor
      San Francisco, CA 94105

1. End-user                  :
2. Software                  :
3. Languages              :
4. Number of Copies     :
5. Platform                  :
6. Use                        :
7. Number of Approved Users :
8. License Fee           :     [XX], invoiced immediately
9. Support Fee           :     18% of License Fee per annum, invoiced annually in advance
10. Payment terms      :     30 days from date of invoice.

Company signature   _____.
Name                  _____
Title                   _____

# EXHIBIT B

**PURCHASE ORDER**
**Under**
**Autonomy Government Reseller Agreement**
**Dated as of June 29, 2006**

**PURCHASE ORDER NO. AUT-03-20-001**

Purchase Order Date:             March 31, 2010 ("Effective Date")

| | |
|---|---|
| From : | MicroTech, LLC ("Reseller")<br>8330 Boone Blvd., Suite 600<br>Vienna, VA 22182 |
| Ship to: | MicroTech, LLC<br>8330 Boone Blvd., Suite 600<br>Vienna, VA 22182<br><br>Shipping Method: Electronic, such as via FTP transfer |
| To: | Autonomy, Inc.<br>One Market, Spear Tower, 19th Floor<br>San Francisco, CA 94105 |

1.  Software:

**IDOL Server licensed for the following operations:**

| | |
|---|---|
| (i) | Retrieval – Advance |
| (ii) | Retrieval – Lite |
| (iii) | Retrieval – Parametric |
| (iv) | Retrieval – Standard |
| (v) | Spelling Correction |
| (vi) | Summarisation |
| (vii) | Hyperlinking |
| (viii) | Script & Icon Recognition |
| (ix) | OCR |
| (x) | Z39.50 Federation |

**Connectors for use with IDOL server:**
All currently available connectors

**Autonomy LiquidOffice**

**Autonomy FITS PlugIn**

**Autonomy SPE**

**Autonomy Mediabin**
(i) FITS image resampling

**Autonomy Archive Solution with the following operations:**
(i) Digital Safe Core Appliance
(ii) Dual-write functionality
(iii) Compression
(iv) User Interface Portal
(v) Object Splitting and Combination

CONFIDENTIAL TREATMENT
REQUESTED BY MICROTECH

MICROTECH 066563

| | | |
|---|---|---|
| 2. Languages | : | All Autonomy supported languages including Latin, Greek and Hebrew. |
| 3. Platform | : | All current Autonomy supported platforms |
| 4. Number of Copies | : | One each of (1) above |
| 5. Number of Instances | : | Unlimited |
| 6. Number of Production Servers | : | Unlimited |
| 7. Number of Non-Production Servers | : | Unlimited |
| 8. Authorized Use | : | Licensee may use the Software and Hardware for the BAV for the project entitled "Digitalizzazione dell'Archivio della Biblioteca Apostolica Vaticana" for storage, processing and search of scanned manuscript images currently held in the Vatican Library. |
| 9. Authorised Number of Uses | : | 200 concurrent users |
| 10. Territory of Software installation | : | Vatican Territory |

11. Fees (Software License,Support and Maintenance) :

| | Phase 1 $ |
|---|---|
| Software plus first year Support and Maintenance | 11,550,000 |
| | |
| | |
| | |

17. Payment Terms : Licensee shall pay Autonomy in accordance with the following:

| Amount | Due and Payable |
|---|---|
| $11.55 million | 90 days from the Effective Date |
| | |

18. Software Delivery : Shipped ExWorks point of manufacture (per Incoterms

CONFIDENTIAL TREATMENT
REQUESTED BY MICROTECH

MICROTECH 066564

Address                    2000) via electronic delivery

20. Commencement Date    :   On Effective Date

21. Expiry Date          :   30 March 2013

Signature below represents Reseller's agreement to purchase the products and services referenced above pursuant to terms of the Autonomy Government Reseller Agreement dated June 29, 2006, and the terms set forth above.

Company signature

Name          Steven B. Truitt

Title         COO

Date          3/31/2010

CONFIDENTIAL TREATMENT
REQUESTED BY MICROTECH

MICROTECH 066565

# EXHIBIT C

**PURCHASE ORDER**
**Under**
**Autonomy Government Reseller Agreement**
**Dated as of June 29, 2006**

**PURCHASE ORDER NO.  MT-AUT-2011-010**
Purchase Order Date:          June 30, 2011 ("Effective Date")

| | |
|---|---|
| From : | MicroTech, LLC ("Reseller")<br>8330 Boone Blvd., Suite 600<br>Vienna, VA 22182 |
| Ship to: | MicroTech, LLC<br>8330 Boone Blvd., Suite 600<br>Vienna, VA 22182<br>Shipping Method: Electronic, such as via FTP transfer |
| To: | Autonomy, Inc.<br>One Market, Spear Tower, 19th Floor<br>San Francisco, CA 94105 |

| | | | |
|---|---|---|---|
| 1. | End-user | : | Hewlett Packard |
| 2. | Software | : | Digital Safe |
| 3. | Authorized Use | : | End-User is licensed to deploy three separate instances of the Digital Safe Software in Section 2 above.  Each instance may be used solely for purposes of hosting and archiving data from a single Client's internal environment for access solely by such Client.  A "Client" is an end-user customer of End User.  In total, End-User may use the Software to store data from up to 3 Clients totaling no more than 100 TB in the aggregate. |
| 4. | Languages | : | English |
| 5. | Platform | : | Windows |
| 6. | Term of Licenses | : | 5 years, subject to termination in accordance with terms of the Agreement |
| 7. | Software License Fee | : | US $7,000,000.00, invoiced immediately |
| 8. | Support Fee (1st year) | : | 5% of Software License Fee, invoiced immediately |
| 9. | Payment terms | : | 25% due 90 days<br>25% due 180 days<br>25% due 270 days<br>25% due 365 days<br>All fees due hereunder are nonrefundable and noncancellable. |
| 10. | Authorized Use | : | Shipped F.O.B. point of manufacture via electronic delivery, such as FTP transfer. |

Signature below represents Reseller's agreement to purchase the products and services referenced above pursuant to terms of the Autonomy Government Reseller Agreement dated June 29, 2006, and the terms set forth above.

VAR shall distribute the above Software to the above-referenced End User upon VAR's receipt of a purchase order or written agreement from End User under which End User, consistent with the terms of the Agreement, agrees to license from VAR the Software and pay to VAR a corresponding license and support fee therefor.  Although End User and VAR currently anticipate entering into such a license transaction, in the unlikely event End User, instead, enters into a direct agreement with Autonomy or its affiliate to license the Software, then VAR shall distribute the Software to End User upon receipt of written notice (which may be via email) from Autonomy ("Distribution Notice") of such direct license transaction.  In the event distribution is accomplished by reason of a Distribution Notice, upon such time as Autonomy has received payment in full for such license fee and support fee, Autonomy shall pay to VAR an amount equal to the license fee paid by End User to Autonomy less the License fee described in Item 7 above, but in no event more than $700,000.00, as full compensation in connection with VAR's efforts in securing End User's procurement of a license of Autonomy software.

VAR  signature
Name          Steven B. Truitt
Title          COO
Date:          June 30, 2011

CONFIDENTIAL TREATMENT
REQUESTED BY MICROTECH