UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICROTECHNOLOGIES, LLC, | Case No. 15-cv-02220-JCS |
| Plaintiff, | |
| v. | **ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT** |
| AUTONOMY, INC., et al., | Re: Dkt. Nos. 70, 83 |
| Defendants. | |

## I.     INTRODUCTION

This case, brought under the Court's diversity jurisdiction, concerns disputes arising from the commercial relationship between Plaintiff MicroTechnologies, LLC ("MicroTech") and Defendants Autonomy, Inc. and Autonomy Systems Limited (collectively, "Autonomy"). MicroTech previously served as a reseller for Autonomy's software products and claims that Autonomy failed to either deliver software or refund MicroTech's payment for anticipated transactions that were never completed with two potential end users, Hewlett-Packard ("HP")[1] and the Biblioteca Apostolica Vaticana (the "Vatican Library"). Autonomy counterclaims that MicroTech aided and abetted former Autonomy directors in breaching their fiduciary duty by artificially inflating Autonomy's reported revenue and similar metrics. Both parties also bring claims for unjust enrichment. The Court held a hearing on March 24, 2017. For the reasons discussed below, each party's motion for summary judgment is GRANTED with respect to the opposing party's unjust enrichment claim, but DENIED with respect to the remaining claims due to genuine issues of material fact.[2]

---

[1] HP later acquired and currently owns Autonomy.
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

## II.    BACKGROUND

### A.    Factual Record

#### 1.  The Reseller Agreement and Course of Dealing

In 2006, MicroTech entered an agreement with Autonomy for MicroTech to resell Autonomy products (the "Reseller Agreement").[3]  As is relevant to this action, the Reseller Agreement provided that MicroTech would market Autonomy's products to federal government customers and to "mutually agreed upon commercial customers," and that MicroTech would maintain marketing centers with sufficient demonstration equipment and trained personnel to demonstrate Autonomy's products and respond to customer inquiries.  Reseller Agreement §§ 3.1(1), 3.1(3), 3.2.  MicroTech was also required to ensure that each customer entered a standard license agreement for the software with MicroTech.  *Id.* § 3.6.  MicroTech's potential services to end users included "demonstrations, pre-sales, support, installation, customization, training and such other consulting or integration of or with respect to the Autonomy products with third party products."  *Id.* § 1.1(22).

The Reseller Agreement provided that MicroTech would submit a purchase order to Autonomy, and—assuming Autonomy did not reject the purchase order, which it retained the right to do—the products would be "shipped by means and on media agreed between the parties, and in the absence of agreement otherwise shall be FTP download or if physical then FOB Point of Origin."  *Id.* § 5.1.  After receiving an order, Autonomy would issue an invoice to MicroTech for the amount due, "equal to 90% of the prices listed in the then current Government Reseller Price List," and MicroTech was required to pay within thirty days.  *Id.* § 5.5 & Ex. B § 2.  The Reseller Agreement specifically provided that MicroTech "shall not be relieved of its obligations to pay fees owed to Autonomy hereunder by the nonpayment of fees by an End User."  Reseller Agreement § 5.5.  The Reseller Agreement also stated that it was an integrated contract representing the entire agreement between the parties, *id.* § 14.10, and that "[n]o amendment to, or

---

[3] The Reseller Agreement appears in the record as Exhibit A to MicroTech's complaint (dkt. 1), the authenticity of which Autonomy admits in its answer, *see* Answer (dkt. 11) ¶ 11, and also as Exhibit 6 to the declaration of Stuart Glass (dkt. 71).

change, waiver or discharge of, any provision of this Agreement shall be valid unless in writing and signed by an authorized representative of each of the parties," *id.* § 14.10.

From 2006 until late 2009, MicroTech sold Autonomy products nearly exclusively to United States government agencies. Jimenez Decl. (dkt. 83-3) ¶ 4 & n.2. Beginning in 2009, MicroTech began to sell Autonomy products to commercial end users at Autonomy's suggestion. *See id.* ¶ 5; Glass Decl. (dkt. 71) Ex. 4 (Jimenez Dep.) at 49:19–52:15. According to MicroTech's owner and chief executive officer Tony Jimenez, Autonomy would frequently call MicroTech to say that Autonomy had an opportunity with an end user, and ask what sort of fee would be required for MicroTech to serve as the reseller on that transaction. *Id.* at 384:2–19. Steven Truitt[4]—who served at different times as MicroTech's chief financial officer, senior vice president, executive vice president, and chief operating officer—managed MicroTech's sales of Autonomy products, and Jimenez was also involved, although he generally did not play a hands-on role in individual deals. Glass Decl. Ex. 4 (Jimenez Dep.) at 12:5–13:22, 14:1–15:2, 40:13–42:6; Glass Decl. Ex. 23 (Esterrich Dep.)[5] at 17:2–18:1, 22:8–10. John Cronin—who at various times worked as a consultant for both MicroTech and Autonomy, *see* Glass Decl. Ex. 4 (Jimenez Dep.) at 81:3–82:5—emailed Truitt about a number of orders for commercial end users "ready to go" on December 31, 2009, and attached purchase orders for MicroTech to complete and return to Autonomy. Bianco Decl. (dkt. 68-5) Exs. A, B. An email between Cronin and an Autonomy employee indicates that certain of those deals were closed by March of 2010. *Id.* Ex. E.

Truitt was employed by MicroTech from approximately 2006 to 2014, at which time the division he then worked in was sold to a different company. Glass Decl. Ex. 4 (Jimenez Dep.) at 10:8–11:8. When counsel for Autonomy deposed Truitt, he refused to answer virtually every question asked of him on the basis that an answer might incriminate him with respect to criminal

---

[4] Steven Truitt's brother David Truitt was a passive co-owner of MicroTech until 2015, and another brother, Dan Truitt, worked at Autonomy. Glass Decl. Ex. 4 (Jimenez Dep.) at 7:18–21, 10:8–13, 113:9–17. Unless otherwise specified, references to "Truitt" in this order refer to Steven Truitt. Steven Truitt is often referenced as "Steve" or "Stephen" Truitt in the record.
[5] Glass's declaration erroneously states that a transcript of Tomas Esterrich's deposition is included at Exhibit 5 and Truitt's deposition is Exhibit 23, when in fact Esterrich's deposition is Exhibit 23 and Truitt's is Exhibit 5. *See* Glass Decl. ¶¶ 6, 24 & Exs. 5, 23.

proceedings. *See generally* Glass Decl. Ex. 5 (Truitt Dep.).

Jimenez's first declaration describes the structure of a typical transaction involving a commercial end user as follows:

> . . . Autonomy would identify an end-user for the purchase of Autonomy software and negotiate an agreement for the sale of the software, inform and provide the details of the transaction to MicroTech and ask MicroTech to issue a purchase order for the software. MicroTech would issue a purchase order for the software, Autonomy would invoice MicroTech for the cost of the software, Autonomy would deliver the software to the end-user and Micro Tech would be paid a fee for its participation, typically ten (10) percent. In some cases, Micro Tech would advance the costs of the software to Autonomy and collect from the end-user, and in others the end-user would pay Autonomy directly and Autonomy would issue a credit to MicroTech for the payment. In all of the commercial transactions, Autonomy controlled the details of the transaction and handled all of the negotiations with the end-user.

Jimenez Decl. ¶ 5; *see also* Jimenez Opp'n Decl. (dkt. 73-3) ¶ 6 ("Although the Reseller Agreement called for MicroTech to be primarily responsible for identifying, negotiating, and finalizing Autonomy software resale opportunities, in practice, it was Autonomy that took on this responsibility for all the commercial transactions . . . .").

Truitt maintained a separate "enterprise" accounting system for Autonomy transactions involving commercial end users, distinct from the "normal" accounting system that MicroTech used for its government contract business. Glass Decl. Ex. 23 (Esterrich Dep.) at 117:9–118:15; *see also id.* at 216:14–15 (stating that a purchase order related to the HP transaction came from Truitt's accounting system).[6] Chief financial officer Tomas Esterrich, who did not have access to that system, had difficulty obtaining documents from Truitt to confirm the validity of Autonomy transactions involving commercial end users, and testified that the experience was "very frustrating." *See id.* at 48:1–5, 177:19–178:5, 239:18–21. According to Esterrich, MicroTech paid invoices from Autonomy regarding government contracts on time, but invoices related to commercial end users "were primarily based on [MicroTech] getting paid," and were not paid

---

[6] Truitt's special "enterprise" accounting process encompassed transactions relating to two of MicroTech's vendors: Autonomy and Microsoft. *See* Glass Decl. Ex. 23 (Esterrich Dep.) at 117:12–14.

until "money was at the bank, the money had been transferred into [MicroTech's] bank account." Glass Decl. Ex. 23 (Esterrich Dep.) at 29:10–30:6. Esterrich testified that MicroTech had "basically . . . no risk" on the commercial transactions "because we were getting paid at the same time we were disbursing the money. So we didn't make any payments unless we had payment from the client." *Id.* at 87:4–8. According to Esterrich, "most of the payments didn't come from the clients, they came from Autonomy." *Id.* at 257:20–21. In some cases, payments MicroTech received for a given project were used to pay Autonomy for a different, older invoice. *Id.* at 258:13–259:7. Esterrich believed that this practice of waiting to receive funds before making payment was based on an informal agreement between Truitt and his counterparts at Autonomy. *Id.* at 134:21–135:4.

Jimenez testified at his deposition that "MicroTech is at risk with every transaction," but that he would not expect that MicroTech would suffer a loss of the full value of the transaction if a deal fell through. Glass Decl. Ex. 4 (Jimenez Dep.) at 93:8–16. Jimenez believed that transactions arranged by Autonomy were "legitimate deals" that would actually occur, but if a "customer changed his mind in the 11th hour, [Jimenez] would assume based upon discussions, [his] personal discussions with the Autonomy people, that they would help [MicroTech] sell that software so that [MicroTech] would not be stuck holding that software." *Id.* at 93:20–94:9. That understanding was based on conversations early in MicroTech's relationship with Autonomy, and Jimenez believed that it held true for all deals going forward from that point. *Id.* at 93:12–94:2. Jimenez testified to his understanding, however, that if software was not successfully resold, MicroTech would still be liable to Autonomy for the full contract price of the software. *Id.* at 95:3–96:1.

Jimenez testified that the primary value that MicroTech's involvement added to sales of Autonomy software was MicroTech's status as a minority-owned and disabled-veteran-owned business, certifications that go along with that status, and the fact that MicroTech is competent and manages its invoices correctly. *Id.* at 122:11–128:13; Jimenez Decl. ¶ 3; Jimenez Opp'n Decl. ¶¶ 2–5. He emphasized that MicroTech met its contractual obligation to maintain a marketing center with demonstration equipment and trained staff, although he was not aware of whether

those resources were utilized with respect to particular transactions.  *See* Glass Decl. Ex. 4 (Jimenez Dep.) at 153:14−158:16, 177:8−17, 197:12−18.

On a number of occasions, Autonomy issued credit memos to MicroTech for certain transactions, including a credit memo for $4,888,800 for a transaction with Morgan Stanley, a credit memo for $1,184,000 for a transaction with Manufacturers Life Insurance, four credit memos for $1,050,000 each for a transaction with the United States Department of the Interior, and a credit memo for $768,500 for a transaction with Bank of Montreal.  Glass Decl. Exs. 24−27. Jimenez testified that end users sometimes incorrectly paid the purchase price directly to Autonomy, rather than to MicroTech, and indicated that in such circumstances Autonomy might issue MicroTech a credit to cancel the amount that MicroTech owed, since Autonomy had instead received payment from the end user.  Glass Decl. Ex. 4 (Jimenez Dep.) at 130:21−131:17, 170:1− 5.  Jimenez suggested that the credit memos MicroTech received from Autonomy might have arisen from those circumstances, or generally from successful transactions—not from transactions that were not ultimately completed.  *See id.* at 130:21−132:12 (discussing a transaction with Morgan Stanley); *id.* at 152:8−14 (discussing a transaction with Manufacturers Life Insurance). Later, in response to questioning from MicroTech's counsel, Jimenez testified that "we've normally had credit memos that have come in after we've established a debt.  And it was either satisfied by the government or our customer paying somebody or it -- the deal went away." *Id.* at 383:10−14 (punctuation as in transcript).

In his second declaration, Jimenez states for the first time that "[i]n the few instances where Autonomy determined that a particular transaction could not be completed, it was understood that Autonomy would make MicroTech whole, and with the exception of the Vatican Library and HP deals, Autonomy did."  Jimenez Opp'n Decl. ¶ 7.  That declaration also states for the first time that the deals with Manufacturers Life Insurance, Morgan Stanley, the Department of the Interior, and Bank of Montreal were "failed . . . transactions," and indicates that the credit memos issued for those transactions were Autonomy's method of "mak[ing] MicroTech whole." *Id.*

When a deal was complete, Autonomy would usually send software directly to the end user

via an FTP server rather than providing it to MicroTech as an intermediary. Glass Decl. Ex. 4 (Jimenez Dep.) at 144:3–10; *see also* Jimenez Decl. ¶ 5 (stating that "Autonomy would deliver the software to the end-user"). MicroTech would "check to see if [the software was], in fact, there" on Autonomy's FTP server before providing the password for Autonomy's server to the end user. Glass Decl. Ex. 4 (Jimenez Dep.) at 349:19−350:3. Jimenez "could find no instance of [MicroTech] ever downloading Autonomy software that was not for [MicroTech's] personal use." *Id.* at 352:6−8. Jimenez testified that the usual practice was similar with respect to license keys: MicroTech did not "get the license key [sic], write them down, and send them as a standard practice to the end users," but instead end users would often "have to get the license key from Autonomy." *Id.* at 346:17−347:1; *see also id.* at 349:19−350:5. According to Esterrich, MicroTech "did not provide financing" to Autonomy. Glass Decl. Ex. 23 (Esterrich Dep.) at 185:2−6.

From time to time, MicroTech would provide certifications to Autonomy's auditors regarding unpaid invoices. *See* Glass Decl. Exs. 29, 41. Autonomy would send a form letter to MicroTech with a list of invoices and amounts due, requesting that MicroTech certify their validity, unpaid status, and that they were not subject to any "side letters or other agreements," and return the letter directly to Autonomy's auditors at Deloitte. *Id.* The letters included an area for MicroTech to note any exceptions, and in some cases MicroTech noted that an invoice had already been partially or fully paid, or that it should be "reversed" because there was "no order" or because the invoice had "not been funded and the product ha[d] not been delivered," while in other cases MicroTech either indicated that there were no exceptions or left that field blank. *Id.* The audit letters were usually (if not always) signed by either Steven Truitt or Tomas Esterrich on behalf of MicroTech. *See id.*

HP acquired Autonomy in October of 2011, in a transaction not directly related to the purported transaction to sell software to HP discussed separately below.

## 2. The Vatican Library Transaction

One of the primary transactions at issue in this case relates to a purported deal for the Vatican Library to buy Autonomy software for archiving, processing, and retrieving images of

manuscripts.  *See* Glass Decl. Ex. 7 (Vatican Library purchase order).  Steven Truitt, as chief

operating officer, signed a purchase order dated March 31, 2010 on behalf of MicroTech for this

transaction, which called for shipment of the software to MicroTech via electronic methods "such

as FTP transfer."  *Id.*  Jimenez states in his first declaration that he personally approved this

transaction.  Jimenez Decl. ¶ 6.  The payment terms specified that the "Licensee" would pay

Autonomy $11,550,000 within ninety days—i.e., by June 29, 2010.  *See id.*  The purchase order

specifically stated MicroTech's "agreement to purchase the products and services referenced

above pursuant to the terms of the . . . Reseller Agreement" and pursuant to the terms stated in the

purchase order itself.  Glass Decl. Ex. 7.  Autonomy issued MicroTech an invoice for $11,550,000

for the Vatican Library transaction the same day as MicroTech issued the purchase order for the

transaction.  Glass Decl. Ex. 36.

According to Autonomy's chief financial officer Christopher Yellen, Autonomy

recognized $11 million in revenue for the Vatican Library transaction in the first fiscal quarter of

2010, which ended in March of that year.  Yellen Decl. (dkt. 74-1) ¶ 2.

Jimenez testified that MicroTech entered into the Vatican Library transaction and

committed to pay Autonomy more than eleven million dollars based on a press release from the

Vatican Library stating that it intended to use Autonomy software.  Glass Decl. Ex. 4 (Jimenez

Dep.) at 230:19−231:22.  Jimenez testified that, as an incentive for Autonomy to use MicroTech

as a reseller, he told Autonomy salespeople that "if we win that Vatican deal, I'm taking you guys

to the Superbowl [sic]" because he was "always trying to incentivize the Autonomy salespeople to

remember [MicroTech] when they walked in to do a deal."  *Id.* at 360:18−361:2.  According to

Jimenez, MicroTech and Autonomy signed the deal for the Vatican Library within a matter of

days after Steven Truitt informed Jimenez that Autonomy had called to offer MicroTech the

opportunity.  *Id.* at 390:18−391:11.  Jimenez states in his first declaration that the Vatican Library

was "Autonomy's customer," and that Autonomy "handled all of the negotiations and MicroTech

had no direct contact with the Vatican Library."  Jimenez Decl. ¶ 9.  Jimenez testified that Steven

Truitt told him that Autonomy had established a price that the Vatican Library would pay, and that

Autonomy represented to Truitt that it would sell the software to MicroTech (to resell to the

Vatican Library) at a discount from that price.  Glass Decl. Ex. 4 (Jimenez Dep.) at

327:16−328:15.

MicroTech provided several letters to Autonomy's auditors certifying that the Vatican

Library invoice was properly charged, entirely or partially unpaid, and not subject to side letters or

other agreements.  Glass Decl. Ex. 29 at MT001021, MT001852−53, MT002008, MT002265−66

& Ex. 41 at AU-MT001303−04, AU-MT002021−22.  Those letters were dated July 8, 2010

($11,500,000 unpaid); October 6, 2010 (same); January 26, 2011 ($6,728,668.29 unpaid); April

19, 2011 (same); July 12, 2011 ($4,611,798.29 unpaid); and July 14, 2011 (same).  *Id.*  On each of

those letters, MicroTech wrote "none," "no exceptions," or "not applicable" in the space to note

exceptions, or in one case only noted an exception applicable to a different invoice.  *Id.*  Esterrich

nevertheless testified to his understanding that the Vatican Library transaction fell within the

scope of the practice that MicroTech would not pay Autonomy until MicroTech itself had received

payment, even though that agreement deviated from the written Reseller Agreement and was not

explicitly noted in any of the audit confirmation letters that MicroTech provided to Autonomy's

auditors.[7]  Glass Decl. Ex. 23 (Esterrich Dep.) at 147:13–14, 177:6–14.

John Cronin emailed Steven Truitt on October 13, 2010 to say that a pending $500,000

payment was "very time sensitive" and should be directed to MicroTech's debt for the "Vatican"

transaction.  Glass Decl. Ex. 10.  Truitt responded that he would talk to Esterrich about making the

payment, *id.*, and the payment was made the following day, Glass Decl. Ex. 13.  MicroTech made

another payment of $4,321,331.71 on December 31, 2010—the same day that it received payment

from Autonomy for the ATIC project discussed below—as well as payments of $2,000,000 on

April 21, 2011 and $2,400,000 on June 30, 2011.  *Id.*  Autonomy wrote off the remaining balance

of $2,328,668.29 in September of 2011, meaning that MicroTech paid a total of $9,221,331.71 for

_____

[7] Esterrich's testimony as to why he did not note this understanding on the audit letters, which
asked if the transactions at issue were subject to side agreements, is somewhat muddled.  *See, e.g.*,
Glass Decl. Ex. 23 (Esterrich Dep.) at 254:2–19 ("Q: . . . I'm asking you again, why is that not
listed here? . . . A: If you look at some of the other documents, look at the terms and conditions,
those are not terms and conditions that are in the federal agreement.  They're different.  So there's
no exceptions.  Whatever's in the, in the purchase order or the invoice, that's what it is.  So, I'm
not taking any exceptions with regards to the agreement.  I'm not taking any exceptions with
regards to what's in the purchase order or the invoice.").

United States District Court
Northern District of California

the Vatican Library transaction.  *See id.*

On January 16, 2011, Esterrich sent an email to Jimenez stating his intent to transfer two million dollars to Autonomy the next day for the Vatican Library transaction.  *Id.* at 209:7–12.  He testified at his deposition that "some money had to be in our account," that "[t]he only way [he could] make a payment is if we have the money in the account based on the agreement that we had that once we get paid, we pay it out," and that the reason the payment was to be made the next day was likely because the money was not yet in MicroTech's account.  *Id.* at 209:12–210:10; *see also id.* at 258 ("Some money has to come from some place before I sent them.").  As noted above, however, financial records indicate that MicroTech did not make a $2,000,000 payment to Autonomy for the Vatican Library transaction until April of 2011.  Glass Decl. Ex. 13.

Jimenez believed that Autonomy had in fact completed a deal with the Vatican Library to sell the software at issue, based in part on a telephone conversation between Truitt and an Autonomy employee (likely Joel Scott) that Jimenez overheard when he walked into the room where Truitt was using the telephone.  Glass Decl. Ex. 4 (Jimenez Dep.) at 329:11–331:10.  Although Truitt wrote in an email dated April 20, 2010 that MicroTech had received the software that was the subject of the Vatican Library transaction, Glass Decl. Ex. 14, and an email from John Cronin indicated that the software had been delivered on a disk on March 31, 2010, *id.* Ex. 15, Jimenez testified that Truitt was mistaken and the email was not accurate because MicroTech did not receive license keys for the software, because MicroTech did not receive the software on a disk, and because the FTP link that MicroTech received was not functional, *id.* Ex. 4 (Jimenez Dep.) at 232:14–235:5, 239:10–240:5, 243:10–244:6, 248:18–249:4, 252:6–12.  Christopher Yellen states in a declaration submitted with Autonomy's reply brief that "an entity like MicroTech . . . may request" license keys after it has downloaded Autonomy software, but that MicroTech never made such a request with respect to this transaction.  2d Yellen Decl. (dkt. 76-1) ¶ 4.

Jimenez believes that MicroTech was "cheated" by Autonomy on the Vatican Library deal, regardless of whether the software and license keys were ever delivered to the Vatican Library.  Glass Decl. Ex. 4 (Jimenez Dep.) at 235:6–237:9, 24:20–242:10, 244:7–10.  According to

Jimenez, when the deal for HP to acquire Autonomy was announced, he resolved to wait "until the dust kind of settles around the acquisition" before requesting that HP "please figure out what the hell is going on with [MicroTech's] Autonomy deal at the Vatican and why [MicroTech] ha[d] still not been paid." *Id.* at 334:2−10. In the period from 2011 through 2013, Jimenez asked Truitt to reduce the amount of business MicroTech did with Autonomy and to "put[] more paper on these deals" to reduce risk and ensure an evidentiary record in case of litigation, particularly in the event that Autonomy went out of business. *Id.* at 338:15−339:1. Jimenez asked Truitt not to "do any more deals where we did verbal deals without all of the paperwork in place," because "[t]here was a lot of that going on." *Id.* at 340:1−4.

   After MicroTech made its last payment to Autonomy for the Vatican Library transaction, MicroTech "reached out to Autonomy on several occasions asking for the status" of the transaction, and Autonomy told MicroTech that it was still being negotiated but would eventually close. Jimenez Decl. ¶ 9. Jimenez sent a letter directly to the Vatican Library dated April 23, 2014 stating that Autonomy had asked MicroTech in 2010 to serve as a reseller for an ongoing project between Autonomy and the Vatican Library, and that MicroTech had purchased $11,550,000 worth of software but had never been paid. Glass Decl. Ex. 9. Jimenez noted a March 2014 press release by another company, NTT Data Corporation, indicating that it had been selected by the Vatican Library for what Jimenez believed was the same project. *Id.* Jimenez sought to obtain confirmation from the Vatican Library that it received and used Autonomy software, and to obtain payment to MicroTech for the software. *Id.* By letter dated May 15, 2014, Monsignor Cesare Pasini of the Vatican Library forwarded Jimenez's letter to "HP Autonomy," stating that Jimenez's assumption that the Vatican Library used Autonomy software was "absolutely false," and that "the current project with NTT DATA is completely new and uses software of NTT DATA and third-party providers, different from Autonomy and MicroTech." *Id.* Pasini went on to explain:

> As you well know, [the Vatican Library] has never dealt with the company MicroTech and was not even aware of its involvement with Autonomy at the time of the latter's contacts with [the Vatican Library] to analyze the possibility of a possible collaboration in the digitization project. As you are aware, this collaboration between

11

> Autonomy and [the Vatican Library] was never formalized, and
> from 2011 Autonomy and [the Vatican Library] have ceased to
> relate.

*Id.* Pasini asked Autonomy to clear up the matter with MicroTech. *Id.* Jimenez states that soon after that, he learned for the first time from the media that Autonomy's transaction with the Vatican Library had "fallen through." Jimenez Decl. ¶ 9.

In May and July of 2013, counsel for Autonomy and HP (which had by that time acquired Autonomy) sent letters to the United States Air Force stating that Autonomy's previous management had used transactions with resellers to artificially inflate Autonomy's stated revenue, and presented the Vatican Library transaction as an example. Jimenez Opp'n Decl. Exs. A, B. Jimenez states in a declaration that the letters led to proceedings by the Small Business Administration, which ultimately cleared MicroTech of any wrongdoing. Jimenez Opp'n Decl. ¶ 13.

### 3. The ATIC Facility

MicroTech developed a demonstration facility known as the Advanced Technology Innovation Center ("ATIC"), or later the "I$^2$C," short for "Innovation & Integration Center."[8] MicroTech submitted a twenty-eight page proposal to Autonomy for creation of the ATIC "featuring" Autonomy software in November of 2010. Jimenez Decl. ¶ 13 & Ex. 2. The record includes a number of internal Autonomy emails and detailed memoranda discussing MicroTech's proposal, substantially all of which stated support for Autonomy investing in the project. Bianco Decl. Exs. O−Q. On December 30, 2010—one day before MicroTech's first multi-million dollar payment on the Vatican Library project—Autonomy issued a purchase order to pay MicroTech $9,600,000 for a "3 Year Option" related to the ATIC, with payment due the following day. Glass Decl. Ex. 11; Bianco Decl. Ex. W.[9] Autonomy now contends that its payment for the ATIC

---

[8] For consistency and clarity, this Order refers to the facility as the "ATIC," even when describing events after MicroTech began using the name "I$^2$C."

[9] Autonomy cites its own accounting journal entries as evidence that it in fact paid the amount due on December 31, 2010, *see* Autonomy Mot. at 7, but the journal entry in the exhibit cited shows a debit and a credit of only $6,205,158.03—not the full $9,600,000—and does not on its face clearly relate to the ATIC project, *see* Glass Decl. Ex. 12. Neither party disputes that the full payment was made, however.

12

transaction was a sham to allow MicroTech to repay its debt for the never-completed Vatican Library, and thus to allow Autonomy to recognize revenue; MicroTech contends that the ATIC deal was a legitimate transaction to promote Autonomy products at the ATIC, and was not related to the Vatican Library transaction.

Esterrich testified that the ATIC facility included a display of Autonomy software, but that other companies' products were also on display, including "SGI" and "a whole bunch of brands." Glass Decl. Ex. 23 (Esterrich Dep.) at 194:16−195:2, 200:6−13. Jimenez likened the ATIC to a car dealership, with the "primary purpose" of not only encouraging customers to buy Autonomy products, but specifically to buy them through MicroTech. Glass Decl. Ex. 4 (Jimenez Dep.) at 385:20−386:19. He states in his first declaration that he "originally conceived of the ATIC [as] a perfect platform to showcase Autonomy software." Jimenez Decl. ¶ 12. According to Jimenez, the ATIC was also intended to reinforce to Autonomy the degree of MicroTech's commitment to Autonomy products, and to demonstrate generally to customers that MicroTech had significant technical capabilities on par with much larger corporations. Glass Decl. Ex. 4 (Jimenez Dep.) at 389:3−390:13. Jimenez testified that the ATIC featured software made by four of five companies, but that the intent of the facility was to demonstrate and sell Autonomy software, with the other software serving as "supporting actors and actresses." *Id.* at 276:16−18, 281:18−282:3. When MicroTech's counsel asked Jimenez whether MicroTech used the ATIC "to market software, other than Autonomy software," Jimenez responded as follows:

> I don't think so. I can't -- I can't think of any instance where we said, buy this; don't buy Autonomy, or this is how it runs, but don't -- we're not going to put Autonomy -- everyone one of the solutions we offered had an Autonomy capability built into it to make it just that much better.
>
> Because we were huge fans of Autonomy. I thought Autonomy was just an amazing product, and so did a lot of people in the environment, including HP, who I think loved Autonomy until somebody decided they overpaid. And all of a sudden they've got buyer's remorse.

*Id.* at 388:3−17. According to Jimenez, "Autonomy worked closely with [MicroTech] through the construction of the ATIC." Jimenez Decl. ¶ 13.

MicroTech issued a press release when the ATIC opened in July of 2011, which generally

touted MicroTech's capabilities and products.  *See* Glass Decl. Ex. 3.  The press release included quotes from senior officers at SGI Federal and Lee Technologies expressing their excitement at partnering with MicroTech on the ATIC, but did not mention Autonomy as a partner on the project.  *Id.*  The only reference to Autonomy was in a section at the end of the press release titled "About MicroTech," which noted—in a list of relationships with twelve vendor corporations— that MicroTech was an "Autonomy Added Value Reseller."  *Id.*

Esterrich believed that vendors' support for the ATIC project primarily consisted of donating equipment and software, but some vendors also contributed funding for marketing purposes.  Glass Decl. Ex. 23 (Esterrich Dep.) at 197:1–22.  He recalled a "transaction" with Autonomy related to ATIC, but testified that "there wasn't money exchanged."  *Id.* at 200:15– 201:10.  Jimenez testified that some companies besides Autonomy contributed technology to use at the ATIC, but those other companies did not pay money for the ATIC project.  Glass Decl. Ex. 4 (Jimenez Dep.) at 404:10−15.  According to Jimenez, companies such as CA Technologies and Microsoft did not pay MicroTech for the use of their software in the ATIC because their products were not prominently featured, but were instead used to make the facility and the Autonomy software functional.  *Id.* at 282:4−284:7.

MicroTech did not a submit to any other companies partnership proposals that were as comprehensive as the proposal it offered to Autonomy, but it approached companies including Lee Technologies, HP, and Dell with more limited proposals.  *Id.* at 295:10−297:2.  Jimenez testified that the deal with Autonomy regarding the ATIC was not exclusive because "Autonomy didn't want that" and it would "defeat[] the whole purpose of having an innovation and integration center," which was to show Autonomy software integrated with other companies' products.  *Id.* at 298:22−301:21.  Jimenez testified that he spoke to a number of Autonomy employees about the ATIC facility, both before and after construction of the facility was complete.  *Id.* at 304:6− 307:21.  Although the ATIC featured Autonomy software, Jimenez testified that it was "not a software center" but rather "the innovation and integration center."  *Id.* at 285:14−19.

More than one hundred companies toured the ATIC to see MicroTech's demonstrations of its capabilities.  *Id.* at 274:6−20.  The ATIC shut down in June or July of 2014 because MicroTech

14

had lost money on it, having "paid in more than [it was] given by Autonomy." *Id.* at

279:16−280:12, 404:7−8.  Although the ATIC had allowed MicroTech to showcase its skills, it did

not result in additional revenue. *Id.* at 404:4−6.  Autonomy's chief financial officer Christopher

Yellen states that Autonomy did not, to his knowledge, use the ATIC, and that Autonomy does not

have records of using the ATIC.  Yellen Decl. ¶ 3.

Jimenez testified that "[s]ome of" the $6,305,000 that MicroTech paid to Autonomy when

MicroTech had received $9,600,000 for the ATIC consisted of "money that had come in from

Autonomy and was going out to Autonomy in payment of outstanding obligations of MicroTech."

*Id.* at 315:3−12.

### 4.  The HP Transaction

The other key transaction at issue in this case involved a purported sale of software to HP,

which originated well before HP eventually acquired Autonomy.  MicroTech submitted a purchase

order dated June 30, 2011 to Autonomy to license Autonomy's Digital Safe software for

$7,000,000 plus a five percent service fee, for a total of $7,350,000, for a transaction involving HP

as the end user, and also relating to the United States Postal Service.  Glass Decl. Ex. 16;[10] Compl.

¶ 23 & Ex. C; *see* Answer ¶ 23 (admitting the authenticity of the purchase order); Jimenez Decl.

¶ 10.  Jimenez personally approved this transaction.  Jimenez Decl. ¶ 10.  Like the Vatican Library

purchase order, the HP purchase order provided that MicroTech agreed to purchase the software

"pursuant to the terms of the . . . Reseller Agreement" and pursuant to the terms stated in the

purchase order itself.  Glass Decl. Ex. 16.  The HP transaction also provided that shipment would

be "via electronic delivery, such as FTP transfer," although it called for MicroTech to distribute

the software to HP, apparently indicating that HP would not receive the software directly from

Autonomy.  *See id.* ("VAR [i.e., Value Added Reseller] shall distribute the above Software to the

above-referenced End-User . . . .").  The purchase order stated that MicroTech and HP anticipated

entering a license transaction, but also included terms in case of the "unlikely event" that HP

---

[10] The record also includes version of the purchase order with a handwritten note indicating that
the five percent service fee came out to $350,000 as the second page of Exhibit 17 to Stuart
Glass's declaration.

instead entered an agreement directly with Autonomy.  *Id.*  Because there is no evidence that such a direct agreement between HP and Autonomy was ever reached, those terms are not recounted here.

Christopher Yellen states that Autonomy recognized seven million dollars in revenue for the HP transaction in the second quarter of 2011, which ended in June of that year.  Yellen Decl. ¶ 2.

Having reviewed documents related to the HP transaction, Jimenez testified that the transaction was structured so that HP (the end user) would download the software from Autonomy's FTP server and receive the license keys from Autonomy.  Glass Decl. Ex. 4 (Jimenez Dep.) at 345:19−352:8.  Jimenez also testified that the license fee terms stated in the purchase order for the HP transaction did not accurately reflect the parties' agreement, although it is not clear in context whether he meant that the agreement materially differed with respect to the license fee, or merely that the purchase order did not contain the complete terms of the agreement.  *Id.* at 356:10−359:13.  He states in his first declaration that "HP was Autonomy's customer and Autonomy handled all the negotiations and was to deliver the software."  Jimenez Decl. ¶ 11.

On June 30, 2011—the effective date of the purchase order—Autonomy sent Steven Truitt an email stating that the Digital Safe software for the HP transaction was ready to download from Autonomy's Customer Support Site ("CSS").  Glass Decl. Ex. 17.  That email also included a reminder that "with an Autonomy CSS account you can download all your licensed Autonomy software, request license keys," and seek support for technical issues.  *Id.*  Yellen states in his reply declaration that MicroTech never requested license keys for the HP transaction.  2d Yellen Decl. ¶ 4.  About two weeks later, on July 14, 2011, Tomas Esterrich signed a letter to Autonomy's auditors indicating that the four invoices for the HP transaction (one for each scheduled payment) were properly issued, unpaid, and not subject to side agreements.  Glass Decl. Ex. 29 at MT002265−66.

The purchase order, which bears Truitt's electronic signature, called for payment of 25% of the total fees 90, 180, 270, and 365 days after the effective date, meaning that the first payment was due September 28, 2011, and stated that "[a]ll fees due hereunder are nonrefundable and

16

noncancellable." *See* Glass Decl. Ex. 16; *see also* Glass Decl. Ex. 5 (Truitt Dep.) at 133:4−5 ("I can't see it. But it looks like it's a digital signature. It's probably mine."). Autonomy issued MicroTech four invoices—one for each of the scheduled payments—dated June 30, 2011, the same day as the purchase order. Glass Decl. Ex. 37. Although the first partial payment was not due until September, MicroTech paid Autonomy the full transaction price of $7,350,000 on August 17, 2011—one day after MicroTech received payment from Autonomy for the Federal Cloud Platform, as discussed below. Glass Decl. Ex. 22. According to Jimenez, even though the parties' agreement called for installment payments over time, MicroTech paid the complete amount due to Autonomy for the HP transaction on August 17, 2011—before it was due—because it "could," and because Jimenez "like[s] to pay all [MicroTech's] bills early when we can." Glass Decl. Ex. 4 (Jimenez Dep.) at 369:5−20.

### 5. The Federal Cloud Platform

According to Jimenez's first declaration, Autonomy approached MicroTech in the summer of 2011 and raised the subject of MicroTech developing a cloud computing platform that complied with security and reliability standards for government data storage—capability that, according to a proposal that MicroTech submitted to Autonomy, Autonomy then lacked, in part due to its status as a foreign company. Jimenez Decl. ¶ 16 & Ex. 3; Glass Decl. Ex. 18. The parties entered a contract accepting MicroTech's proposal on August 15, 2011. Bianco Decl. Ex. T. MicroTech submitted an invoice dated August 15, 2011 to Autonomy for $8,200,000 for the Federal Cloud Platform. Glass Decl. Ex. 18. Autonomy paid MicroTech $8,200,000 the next day (August 16, 2011) which was one day before MicroTech paid Autonomy the full $7,350,000 for the HP transaction. *Id.* Exs. 19−22. Much like the parties' positions regarding the ATIC transaction, Autonomy contends that the Federal Cloud Platform transaction was a sham to allow MicroTech to pay for the HP transaction, while MicroTech argues that the Federal Cloud Platform deal was a legitimate project unrelated to the HP transaction.

Jimenez testified that MicroTech "[d]esigned, developed, implemented, tested, retested, redesigned, redeveloped, [and] reimplemented" the Federal Cloud Platform in response to changing government requirements. Glass Decl. Ex. 4 (Jimenez Dep.) at 371:6−12; *see also*

Jimenez Decl. ¶ 18.  Jimenez states in his first declaration that MicroTech completed the project and obtained two patents related to its development.  *Id.* ¶ 19.  According to Jimenez, the Federal Cloud Platform "was developed and accessible if Autonomy wanted to use it, had Autonomy wanted to use it" but by the time the product was completed and Jimenez prepared a document stating that the platform was available for use, "Autonomy was no longer Autonomy"—having been acquired by HP—and HP was not interested in talking to Jimenez about it and would not accept the document he prepared.  Glass Decl. Ex. 4 (Jimenez Dep.) at 372:3−373:6.  Jimenez believed that MicroTech no longer had an obligation to proceed with the project after Autonomy was purchased by HP, but nevertheless attempted to convince HP to work with MicroTech on continuing to develop the Federal Cloud Platform.  *See id.* at 372:21−378:5.  According to Jimenez, HP sought to distance itself from MicroTech because, after the acquisition, HP had a change of heart with respect to Autonomy, began to publicly criticize Autonomy, and "abandon[ed] many of the former Autonomy initiatives" due to a dispute between HP and former Autonomy principals.  *Id.* at 377:22−378:21; Jimenez Decl. ¶ 20.  Christopher Yellen states that MicroTech did not deliver the Federal Cloud Platform to Autonomy, Yellen Decl. ¶ 6, but Jimenez states that the concept of "delivery" is not applicable to a cloud platform, and that it was in fact made available to Autonomy, Jimenez Opp'n Decl. ¶ 14.

Jimenez states in his first declaration that the Federal Cloud Platform "was the next step in the evolution from" the ATIC, that the two projects were "one joint development effort," and that MicroTech spent "over $10 million" across the two projects.  Jimenez Decl. ¶¶ 16, 21.

### 6.  Acquisition and UK Court Proceedings

HP acquired Autonomy for $10.3 billion in October of 2011, and subsequently announced an impairment charge of $8.8 billion, in large part due to what HP perceived as accounting improprieties at Autonomy.  Bianco Decl. Ex. X.[11]  HP and Autonomy sued two of Autonomy's

---

[11] The Court does not decide at this time whether the media reports that MicroTech submits regarding the acquisition are admissible evidence.  These background facts are not directly relevant to either party's present motion, and regardless, the Court is satisfied that MicroTech could show the *contents* of these reports through admissible evidence at trial if necessary.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir. 2003).

18

former directors, Michael Lynch and Sushovan Hussain, in a United Kingdom court in 2015 for artificially inflating or misrepresenting Autonomy's revenue, profit, and growth. Bianco Decl. Ex. M; *see generally Autonomy Corp. Ltd. v. Lynch*, Claim No. HC-2015-001324 (High Court of Justice, Chancery Division, London, U.K.). That litigation is ongoing. *See* Joint Case Management Statement (dkt. 90) ¶ 10.

### B. Procedural History

MicroTech filed this action on May 18, 2015, bringing claims for breach of contract and unjust enrichment against Autonomy with respect to both the Vatican Library transaction and the HP transaction (a total of four claims), and naming HP as a nominal defendant. *See generally* Compl. (dkt. 1). After the parties declined to consent to the jurisdiction of a magistrate judge, the case was assigned to the Honorable Ronald Whyte. *See* dkts. 7, 8. Autonomy filed an answer and counterclaim, alleging that Autonomy (under previous management) and MicroTech entered a series of sham transactions as a way to improperly inflate or accelerate Autonomy's recognition of profit and revenue. *See generally* Answer & Counterclaim (dkt. 11). Autonomy brings a claim for aiding and abetting a breach of fiduciary duty and a claim for unjust enrichment. *Id.* After HP moved to dismiss MicroTech's claims against it and Autonomy Systems Limited ("ASL") moved to intervene, the parties stipulated to HP's dismissal and ASL's intervention, subject to certain conditions, and the Court endorsed the stipulation as so ordered. Stipulation and Order (dkt. 29).

After both parties filed and fully briefed their present motions for summary judgment, Judge Whyte announced his decision to take inactive status, and the case was reassigned to the undersigned magistrate judge upon consent of the parties. *See* dkts. 78−82.

### C. Parties' Arguments

#### 1. Autonomy's Motion for Summary Judgment

Autonomy moves for summary judgment on all of MicroTech's claims. Autonomy argues that the Reseller Agreement placed the burden of marketing the software on MicroTech, and notes the language of the Reseller Agreement specifically providing that MicroTech "shall not be relieved of its obligations to pay fees [invoiced by] Autonomy . . . by the nonpayment of such fees by an End User." Autonomy Mot. (dkt. 70) at 4−5, 14−15 (quoting Reseller Agreement § 5.5).

Autonomy contends that MicroTech explicitly acknowledged to Autonomy's auditors that it owed the amount at issue in both the Vatican Library transaction and the HP transaction and disclaimed the existence of any "side letters or other agreements." *Id.* at 8−9. Autonomy also contends, however, that its officers at the time entered an unwritten side agreement with MicroTech that MicroTech would agree to purchase software from Autonomy while a potential agreement with an end user was in the works, but would pay Autonomy for the software only after MicroTech had been paid by an end user or by Autonomy itself, as a ruse to inflate Autonomy's reported revenue. *Id.* at 9−10. If MicroTech "owed" Autonomy money for an end-user transaction that ultimately never materialized, such as those with the Vatican Library and HP, Autonomy would either cancel MicroTech's debt or purport to purchase products or rights from MicroTech that Autonomy did not actually need. *Id.* at 11. According to Autonomy, MicroTech's statements to Autonomy's auditors were knowingly false. *Id.* at 11−12.

Because the Reseller Agreement explicitly allocated to MicroTech the risk of end users not paying for products, Autonomy argues that it is entitled to summary judgment on both of MicroTech's claims for breach of contract. *Id.* at 14−15. Moreover, because a valid contract on the subject existed, Autonomy contends that it is also entitled to summary judgment as to MicroTech's unjust enrichment claims. *Id.* at 16 (citing, *e.g.*, *Maples v. Solarwinds, Inc.*, 50 F. Supp. 3d 1221, 1232−33 (N.D. Cal. 2014)). Even if that were not so, Autonomy argues that principles of laches, waiver, and unclean hands bar MicroTech's claims. *Id.* at 17−19.

### 2. MicroTech's Opposition

MicroTech argues that its claims should proceed because it paid Autonomy more than sixteen million dollars in the transactions at issue, it received nothing in return, and the parties "had modified [their] obligations under the written agreement through their years of conduct pursuant to the same agreement." MicroTech Opp'n (dkt. 73) at 1. According to MicroTech, its primary contribution to Autonomy's business was MicroTech's status as "an 8(a) Small and Disadvantaged Business" and a "Service-Disabled, Veteran-Owned Small Business" for the purpose of securing government contracts, and despite contract language to the contrary, Autonomy—not MicroTech—often took responsibility of "all aspects of the transaction—from

identifying the deal to finalizing the deal, and everything in between." *Id.* at 2−3.  When

MicroTech began to be involved in Autonomy's deals with corporate clients, its role was merely

to issue a purchase order and advance the cost of the software until the deal closed, at which time

the customer would pay Autonomy directly and Autonomy would pay MicroTech a commission.

*Id.* at 4−5.  MicroTech contends that if a commercial deal was not ultimately consummated,

Autonomy would issue a credit memo to MicroTech or otherwise cancel its debt, although

MicroTech considered the chance of such an outcome to be de minimis—hence its reports to

Autonomy's auditors that the debts were valid and not subject to side agreements.  *Id.* at 6.

Although MicroTech acknowledges some question as to whether software was delivered or made

available to it in the transactions at issue, it contends that Autonomy never provided license keys

necessary to operate the software for either transaction, and that MicroTech never accessed or

downloaded software that might have been made available to it for the HP transaction.  *Id.* at 7−9.

MicroTech also argues that other transactions Autonomy characterizes as shams were in fact

legitimate.  *Id.* at 10−11.

With respect to its breach of contract claims, MicroTech argues that summary judgment

should be denied because, despite Autonomy's arguments regarding the language of the Reseller

Agreement, "Autonomy and MicroTech mutually ignored the form Reseller Agreement and

instead operated under a different set of understandings."  *Id.* at 12.  Although the agreement by its

terms provided that modifications must be in writing, MicroTech cites California case law holding

that parties can effectively waive such a provision through conduct.  *Id.* at 12−14 & nn.65, 70.

MicroTech relies in part on the allegations of Autonomy's counterclaims as demonstrating the

parties' mutual understanding that the terms had been modified.  *Id.* at 15 & n.77.  Moreover, even

if the agreement had not been modified, MicroTech contends that Autonomy materially breached

the agreement by failing to provide license keys necessary to use the software at issue.  *Id.* at 15.

As for its unjust enrichment theory, MicroTech presents only three sentences arguing that

Autonomy's motion for summary judgment is "premature" as to those claims because MicroTech

may plead them in the alternative, in the event "that the Court rules that one or all of the

transactions at issue fall outside the relevant legally binding agreements."  *Id.* at 16.  MicroTech

cites the federal rule allowing pleading in the alternative and a district court decision denying at the pleadings stage a motion to dismiss unjust enrichment claims brought alongside breach of contract claims. *Id.* at 16 n.80 (citing Fed. R. Civ. P. 8(d); *Weingand v. Harland Fin. Sols., Inc.*, No. C-11-3109 EMC, 2012 WL 3763640, at *4 (N.D. Cal. Aug. 29, 2012)).

MicroTech also contends that Autonomy's waiver argument fails, primarily because, according to MicroTech, it filed its claims within a reasonable period of time after the transactions at issue. *Id.* at 16−19. MicroTech does not address in this section of its brief why its representations to Autonomy's auditors did not constitute waiver, *see id.*, although in an earlier summary of the facts it contends that such representations were generally based on its understanding that the transactions at issue were very likely to occur and that the arrangement of Autonomy reimbursing MicroTech for unfulfilled transactions "was not a 'side agreement'" but rather "the primary agreement [as] understood by all parties involved," *id.* at 6. According to MicroTech, it is not necessary to address Autonomy's laches and unclean hands arguments because they relate only to the purportedly premature motion to dispose of MicroTech's unjust enrichment claims, but regardless, those "arguments are nothing more than a rehash of [Autonomy's] baseless waiver argument." *Id.* at 16 n.80.

### 3. Autonomy's Reply

Autonomy disputes MicroTech's position that the parties amended the Reseller Agreement through conduct, citing MicroTech's complaint and motion for summary judgment, Jimenez's deposition, and contemporaneous documents as showing that MicroTech believed and agreed that the transactions at issue were governed by the written Reseller Agreement. Autonomy Reply (dkt. 76) at 1−4. According to Autonomy, MicroTech's current position that the agreement had been mutually modified contradicts its earlier positions and relies solely on portions of Jimenez's declaration that contradict his deposition testimony. *Id.* at 4−5. Autonomy contends that MicroTech "cannot avoid summary judgment by advancing a theory that is different from its pleaded theory." *Id.* at 5−7 (citing, *e.g.*, *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291−92 (9th Cir. 2000)). Autonomy further argues that the portions of Jimenez's declaration on which MicroTech relies are inadmissible for lack of personal knowledge, that they are irrelevant because

a party's undisclosed intent has no bearing on contract interpretation, and that MicroTech cannot create an issue of material fact by contradicting Jimenez's earlier deposition testimony. *Id.* at 7−10.

To the extent that MicroTech relies on the allegations of Autonomy's counterclaim to support its view that the transactions at issue were not conducted pursuant to the Reseller Agreement, Autonomy argues that such reliance essentially admits that the transactions were part of a fraudulent scheme to inflate Autonomy's revenue, and that any agreement as part of such a scheme is unenforceable due to its illegal object. *Id.* at 10−13. Autonomy also contends that MicroTech's representations to Autonomy's auditors, if they were not a knowing part of a fraudulent scheme, constitute a waiver of any right to reimbursement. *Id.* at 14−15.

### 4. MicroTech's Motion for Summary Judgment

MicroTech seeks summary judgment in its favor on its own claims for breach of contract, and on both of Autonomy's counterclaims. *See generally* MicroTech Mot. (dkt. 83).[12]

With respect to the breach of contract claims, MicroTech highlights the undisputed fact that it paid Autonomy more than sixteen million dollars for the Vatican Library and HP transactions, but disputes Autonomy's positions that (1) MicroTech was responsible under the parties' contract for ensuring the completion of the deals; and (2) the ATIC and FCP deals were sham transactions that made MicroTech whole for its payments. *Id.* at 13−15. MicroTech notes that Autonomy itself alleges that MicroTech was not involved in efforts to license products in the transactions at issue, and therefore contends that it was not responsible for closing the deals or the risk of nonpayment by end users because the end users were not "its customers" within the meaning of the Reseller Agreement. *Id.* at 14. MicroTech also argues that the ATIC and FCP transactions were legitimate—and not shams to compensate MicroTech for the payments it made on the Vatican Library and HP transactions—because the parties engaged in bona fide negotiations and MicroTech spent more than ten million dollars "to design, develop, build, and

---

[12] MicroTech initially moved to file portions of its motion under seal, based on Autonomy's confidentiality designations. *See* dkt. 68. After the Court denied the request to file under seal, *see* dkt. 77, MicroTech filed the motion in the public record at docket entry 83.

operate ATIC and the Federal Cloud Platform, under the terms of its agreements with Autonomy." *Id.* at 13−14. MicroTech's motion does not, however, identify any source for Autonomy's purported contractual obligation to refund MicroTech's payments. *See generally id.*

Turning to Autonomy's counterclaim for aiding and abetting a breach of fiduciary duty, MicroTech argues briefly that Autonomy has produced neither evidence of accounting fraud by Autonomy's former directors nor evidence that MicroTech knew of or participated in such wrongful conduct. *Id.* at 15.

As for Autonomy's unjust enrichment claim, MicroTech contends that "each transaction at issue was predicated upon a negotiated, legally binding, agreement that defined the rights of the parties," thus barring a claim for unjust enrichment. *Id.* at 16. MicroTech argues, moreover, that it did not receive any funds as a result of the Vatican Library or HP transactions, and thus has not been unjustly enriched through those never-completed deals. *Id.* To the extent that Autonomy seeks to recover payments made for the ATIC and FCP deals, MicroTech contends that the evidence shows not only that those projects were governed by binding, written agreements, but also that MicroTech met its obligations under those agreements. *Id.* at 16−17. Finally, with respect to other commercial reseller transactions, MicroTech argues that it met its obligations under section 3.1 of the Reseller Agreement. *Id.* at 17−18.

### 5. Autonomy's Opposition

Although Autonomy does not believe that the Reseller Agreement "stated the actual relationship between MicroTech and the Autonomy Parties" with respect to the transactions at issue, it contends that MicroTech's breach of contract claims nevertheless depend on the theory that the Reseller Agreement was a binding agreement breached by Autonomy. Autonomy Opp'n (dkt. 74) at 3 n.2. According to Autonomy, the Reseller Agreement by its terms makes MicroTech "unconditionally liable to Autonomy to pay the price of the Autonomy software that MicroTech licensed," and does not support MicroTech's position that the payments were merely advances that would be refunded if deals fell through. *Id.* at 5. Autonomy contends that MicroTech's present theory relies instead on statements in Jimenez's declaration about communications between Truitt and unidentified Autonomy representatives, which are not admissible because Jimenez lacks

24

1   personal knowledge of the communications at issue. *Id.* at 5−7. Truitt invoked his rights under

2   the Fifth Amendment to refuse to answer any questions when he was deposed for this case. *Id.* at

3   6 & n.4. Even if such evidence were admissible, Autonomy argues that oral agreements between

4   MicroTech and Autonomy would not be enforceable because the Reseller Agreement required any

5   amendments to be in writing. *Id.* at 7.

6       As for MicroTech's unjust enrichment claims, Autonomy contends that MicroTech is not

7   entitled to summary judgment because MicroTech's reliance on an express contract precludes such

8   a claim, because these equitable claims are barred by laches and unclean hands, and because

9   Autonomy was not actually enriched by the transactions. *Id.* at 8.

10      Autonomy disputes MicroTech's position that the ATIC and FCP deals were legitimate

11  transactions. *Id.* at 9−12. Autonomy relies on Esterrich's testimony that MicroTech would not

12  pay Autonomy for commercial invoices until MicroTech itself had been paid. *Id.* at 9 (citing

13  Glass Decl. Ex. 12 (Esterrich Dep.) at 34:3−12)). That testimony suggests, in Autonomy's view,

14  that the payments Autonomy made to MicroTech purportedly for the ATIC and FCP projects—

15  each within a day before MicroTech began to pay or fully paid for the Vatican Library and HP

16  transactions, respectively, and each for slightly more than the amount that MicroTech ultimately

17  paid back to Autonomy on those transactions—indicate that the ATIC and FCP deals were shams

18  designed to fund MicroTech's subsequent payments to Autonomy on the Vatican Library and HP

19  transactions. *Id.* at 10−11. Autonomy contends that this conclusion is bolstered by the fact that

20  Autonomy paid nearly ten million dollars to be merely one of twelve "partners" for the ATIC

21  facility, which was intended to showcase MicroTech's capabilities, and which Autonomy never

22  used. *Id.* at 10−11. Similarly, Autonomy asserts that MicroTech never actually delivered the FCP

23  product to Autonomy, and Autonomy never requested delivery or inquired about the status of the

24  product, despite payment of more than eight million dollars for it. *Id.* at 11−12. Autonomy argues

25  that the FCP deal was created to allow Autonomy's former management to treat the HP software

26  transaction as closed at a time when it could have been "a potential embarrassment" due to the

27  beginning of negotiations regarding HP's acquisition of Autonomy as a whole. *Id.*

28      Finally, as for Autonomy's counterclaims, Autonomy contends that Jimenez's declaration

25

regarding the parties' deviation from the terms of the Reseller Agreement with respect to commercial transactions—specifically, that MicroTech received substantial commissions even though it did not actually provide services for the underlying transactions, except to issue purchase orders that did not constitute binding purchase commitments and to confirm the validity of debts arising from those purchase orders to Autonomy's auditors—could support an inference that Jimenez knew MicroTech was being paid to participate in a scheme to artificially inflate Autonomy's reported revenue. *Id.* at 13−14. Autonomy also argues that a reasonable jury could conclude that such a scheme was designed to benefit Autonomy's then-directors, who owned a substantial portion of its stock, at the expense of the company as a whole, and thus constituted a breach of their fiduciary duties, knowingly aided and abetted by MicroTech. *Id.* at 15−16. Because as part of this scheme MicroTech received more from the purportedly fraudulent ATIC and FCP transactions than it paid back to Autonomy for the Vatican Library and HP deals, Autonomy contends that MicroTech was unjustly enriched.

### 6. MicroTech's Reply

According to MicroTech, the undisputed fact that Autonomy did not deliver software license keys for the Vatican Library or HP transactions, as required by section 5.1 of the Reseller Agreement, is sufficient for MicroTech to prevail on summary judgment on its breach of contract claims. MicroTech Reply (dkt. 75) at 1−2, 3, 7. MicroTech contends that the record demonstrates that as the parties adapted their relationship to include commercial as well as government end-user transactions, they modified the Reseller Agreement through their conduct such that Autonomy would select end users and provide the details of the transaction to MicroTech, MicroTech would issue a purchase order and agree to pay for the software, MicroTech would receive a commission for its participation, and Autonomy would make MicroTech whole if the transaction was not completed, generally by issuing a credit memo. *Id.* at 3−5. MicroTech cites credit memos issued by Autonomy as evidence of this course of dealing. *Id.* at 7−8. As in its opposition to Autonomy's motion, MicroTech argues that its statements to Autonomy's auditors disclaiming "side agreements" were truthful because both parties considered Autonomy's purported obligation to reimburse MicroTech for aborted transactions to be part of the primary agreement, not a

1    separate side agreement, and according to MicroTech, the auditors were informed of this

2    arrangement. *Id.* at 5−6.

3           With respect to Autonomy's arguments regarding undue delay, MicroTech contends that it

4    was reasonable to "wait and see if the dust would settle" during civil and criminal investigations in

5    the United States and United Kingdom, and thus defends its approach of waiting until near the end

6    of the statute of limitations to bring its claims. *Id.* at 9.  MicroTech also argues that mere delay is

7    not an affirmative act sufficient to establish waiver of a claim. *Id.* at 9−10.

8           MicroTech reiterates its argument that Autonomy has not identified any evidence of

9    fraudulent accounting practices by Autonomy's previous management, as would be necessary for

10   Autonomy's claim that MicroTech aided and abetted the former managers' breach of fiduciary

11   duty, nor evidence that MicroTech actually knew of such fraud. *Id.* at 2−3, 14.  MicroTech also

12   contends that the ATIC and FCP deals were legitimate transactions subject to written agreements,

13   that Autonomy has not offered concrete evidence that the transactions were fraudulent, and that

14   the appropriate recourse if Autonomy believed that MicroTech had not satisfied its obligations

15   under those agreements would have been to bring claims for breach of contract. *Id.* at 10−12.

16   According to MicroTech, the practice of involving small businesses with relevant certifications to

17   take advantage of incentive programs favoring such businesses is common, and rebuts any

18   inference of fraud that Autonomy suggests would arise from MicroTech's lack of active

19   participation in the transactions at issue. *Id.* at 13.

20   **III.    ANALYSIS**

21        **A.    Legal Standard**

22          Summary judgment on a claim or defense is appropriate "if the movant shows that there is

23   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

24   law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

25   the absence of a genuine issue of material fact with respect to an essential element of the non-

26   moving party's claim, or to a defense on which the non-moving party will bear the burden of

27   persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

28          Once the movant has made this showing, the burden then shifts to the party opposing

27

summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1996). Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact. *Id.* at 1229; *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). Conclusory, speculative testimony in affidavits and arguments in moving papers are insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

In considering Autonomy's motion for summary judgment, the Court therefore draws all reasonable inferences in favor of MicroTech, and in considering MicroTech's motion, the Court draws all reasonable inferences in favor of Autonomy.

### B. MicroTech's Breach of Contract Claims

Under California law, the "cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1391 n.6 (2004). The parties' arguments here focus on the first and third element—whether the parties had a valid contract, what its terms were, and whether Autonomy breached those terms—but also touch on

whether MicroTech performed its contractual duties.

### 1. Evidence to Support the Claims

The first element of the claim is whether there was a valid contract. There is no real dispute that the Reseller Agreement was a binding contract when the parties entered it—or at the very least that a trier of fact could rationally find that it was. The extent to which the written terms of the Reseller Agreement remained in effect, however, is open to interpretation.

There is a great deal of evidence that the parties' course of business differed from the terms of the Reseller Agreement. *See, e.g.*, Jimenez Decl. ¶ 5 (stating that Autonomy, rather than MicroTech, would identify end users and negotiate deals); Jimenez Opp'n Decl. ¶ 6 (same, and noting that this course of conduct deviated from the Reseller Agreement); Glass Decl. Ex. 23 (Esterrich Dep.) at 29:10–30:6, 87:4–8, 257:20–21 (stating that MicroTech had "basically . . . no risk" because it did not pay Autonomy's invoices until it had received payment on the transaction, usually from Autonomy). As MicroTech notes in its opposition brief, California law recognizes that parties may impliedly waive or modify responsibilities under a contract through conduct, even where the contract includes a clause requiring any modification to be in writing. *See Biren v. Equality Emergency Med. Grp., Inc.*, 102 Cal. App. 4th 125, 141 (2002) ("But 'the parties may, by their conduct, waive such a provision' where evidence shows that was their intent." (citation omitted)); *see also Epic Med. Mgmt., LLC v. Paquette*, 244 Cal. App. 4th 504, 511−12 & n.5 (2015) (declining to disturb an arbitrator's determination that the parties modified a contractual compensation structure through conduct, despite an integration clause and provision requiring that modifications be in writing).

This factual record is amenable to a number of interpretations of what, if any, modifications the parties made to the Reseller Agreement through their conduct. For example, There is evidence that Autonomy generally assumed responsibility for identifying commercial end users and negotiating deals, a practice that deviates from section 3.1 of the Reseller Agreement's requirement that MicroTech actively market the products it sold. But MicroTech's claims rely on the theory that Autonomy breached by not delivering software *to MicroTech*, and it is not clear whether MicroTech maintained a right to receive functional software under sections 5.1 and 9.1(2)

of the Reseller Agreement where it did not participate in efforts to market the software as required by section 3.1, because the record indicates that MicroTech never received software from Autonomy as part of a reseller transaction. Glass Decl. Ex. 4 (Jimenez Dep.) at 352:6−8 (testifying that Jimenez "could find no instance of [MicroTech] ever downloading Autonomy software that was not for [MicroTech's] personal use.").

Drawing all rational inferences in favor of MicroTech, a factfinder could determine that Autonomy waived any requirement that MicroTech actively market the software to end users, but that MicroTech retained a right to delivery of software so long as it complied with other terms, such as submitting a purchase order pursuant to section 5.1 and providing payment. If that is so, there is evidence that MicroTech performed the contract as modified, and Autonomy breached by failing to provide the license keys.[13] On the other hand, given that there is no evidence of MicroTech ever receiving and downloading software and license keys in a transaction like this, a factfinder drawing all reasonable inferences in favor of Autonomy might determine that the parties' course of conduct only reflected a shared intent that MicroTech receive a commission for serving as a reseller (essentially for providing its small and disadvantaged business certifications, apparently) on transactions that Autonomy negotiated and *actually closed*, and not that MicroTech would be entitled to contractual remedies for deals that Autonomy attempted but failed to close without MicroTech meeting its own contractual obligations to market the software.

Moreover, even if Autonomy had an obligation to provide license keys, the evidence is ambiguous as to whether it met that obligation. The email by which Autonomy alerted MicroTech that the software for the HP transaction was available to download stated that MicroTech could use Autonomy's Customer Service Site ("CSS") to "request license" keys, among other functions. Glass Decl. Ex. 17. But there is no evidence to clarify whether that meant that the license keys at issue in the transaction were actually available, or merely that the CSS had the capability to

---

[13] Although there is evidence that MicroTech never requested the license keys, *see* 2d Yellen Decl. ¶ 4, it is not clear that the Reseller Agreement requires MicroTech to take any further steps to obtain the keys. A strict reading of the Reseller Agreement suggests that Autonomy is responsible for delivering fully functional software upon receipt of a valid purchase order. *See* Reseller Agreement § 5.1.

provide license keys *if* they were available.  Drawing all reasonable inferences in favor of Autonomy, a factfinder could determine that it met its obligation by sending that email, or perhaps that the parties' course of business required a party who was entitled to license keys to request them through the CSS.  Conversely, drawing all reasonable inferences in favor of MicroTech, and crediting Jimenez's statement that Autonomy did not provide license keys for either transaction, Jimenez Opp'n Decl. ¶ 11, a factfinder could determine that Autonomy breached its duty to provide functional software by not actually providing necessary license keys.

The same is true as to other aspects of the Reseller Agreement and theories of implied modification.  The evidence is in conflict as to whether MicroTech bore the risk of deals not being closed with end users.  The Reseller Agreement itself, of course, specifically provided that MicroTech would retain its obligation to pay Autonomy even if an end user did not pay as required, Reseller Agreement § 5.5, and each purchase order, as well as the letters to Autonomy's auditors, confirmed that the transactions at issue were subject to the Reseller Agreement.  Jimenez initially testified at his deposition that MicroTech was "at risk with every transaction" and that Autonomy would not relieve MicroTech of its obligation to pay if a deal with an end user fell through.  Glass Decl. Ex. 4 (Jimenez Dep.) at 93:6−9, 95:3−9.  That evidence supports Autonomy's view that MicroTech was not entitled to any payment or refund from Autonomy for transactions that were not consummated with an end user.  But Esterrich testified that MicroTech faced "basically . . . no risk," Glass Decl. Ex. 23 (Esterrich Dep.) at 86:19−87:6, and there is some evidence that MicroTech's obligations to pay Autonomy were not considered valid when a deal was not reached with an end user, *e.g.*, Glass Decl. Ex. 29 at MT001997 (stating in a letter to Autonomy's auditors that one invoice "should be reversed since there was no order from the Dept. of Veterans Affairs" and another "should be reversed because it has not been funded and the product has not been delivered").  Contrary to his deposition testimony, Jimenez states in a declaration that "it was understood that Autonomy would make MicroTech whole" if a transaction was not completed.  Jimenez Opp'n Decl. ¶ 7.[14]  Thus, there is also evidence to support

---

[14] Given that Jimenez's declaration is not the only evidence that MicroTech was not subject to risk on reseller transactions, the Court declines to disregard it as an improper effort to manufacture an

MicroTech's position that the parties' agreement was modified by conduct to ensure that MicroTech did not bear such risk.

Nor do the credit memos that MicroTech received from Autonomy necessarily lend themselves to a single interpretation. Of the various credit memos at issue, perhaps the most discussed in the record is that pertaining to a transaction with Morgan Stanley. *See* Glass Decl. Ex. 24. Esterrich testified at his deposition that the credit memo indicates that the Morgan Stanley transaction was subject to "a reversal," or in other words was "voided," with the software licenses at issue either reverting to Autonomy or being transferred to a different end user—suggesting that Autonomy used credit memos to relieve MicroTech of its debts when transactions fell through. Glass Decl. Ex. 23 (Esterrich Dep. at 141:9−144:15). Jimenez states the same in his opposition declaration—that the "credit memos for the failed Manufacturers Life Insurance, *Morgan Stanley*, Dep't of the Interior, and Bank of Montreal transactions" are examples of Autonomy making MicroTech whole for transactions that were never completed. Jimenez Opp'n Decl. ¶ 7 (emphasis added). But Jimenez testified at his deposition that his understanding of the Morgan Stanley transaction was that "a deal had closed," Morgan Stanley had paid for it, MicroTech would have been "on the hook for paying $4.8 million to Autonomy" if the deal had not closed, and the credit memo was a result of Morgan Stanley having made payment directly to Autonomy instead of to Microtech as had been intended. Glass Decl. Ex. 4 (Jimenez Dep.) at 60:17−21, 95:18−96:5, 130:21−131:17.[15] An internal Autonomy email also listed the Morgan Stanley transaction as a "closed" deal as of March of 2010, suggesting—albeit with some ambiguity—that the transaction was successful. Bianco Decl. Ex. E. Taking this evidence together, a factfinder could come out either way on the question of whether the credit memos indicate a course of dealing where Autonomy made MicroTech whole for transactions that were not ultimately closed with an end

---

issue of fact by contradicting his earlier deposition testimony. *Cf. Block v. City of Los Angeles*, 253 F.3d 410, 419 n.2 (9th Cir. 2001). Regardless, the other evidence discussed above would be sufficient to create a genuine issue of whether MicroTech was at risk in the transactions at issue.

[15] As with Jimenez's statements about MicroTech's risk or lack thereof, disregarding Jimenez's declaration about the nature of the credit memos due to its conflict with his earlier testimony would not affect the outcome because both interpretations are supported by other evidence—here, Jimenez's earlier deposition testimony conflicts, and later his declaration comports, with Esterrich's deposition testimony.

user.

Finally, neither party is entitled to summary judgment on the question of whether the ATIC and Federal Cloud Platform deals were legitimate transactions or merely methods of funneling money to MicroTech so that it could pay for the Vatican Library and HP transactions. Based on Jimenez's testimony, the detailed proposals submitted to Autonomy, and internal Autonomy emails and documents discussing the ATIC on its merits as a resource for Autonomy (virtually all of which state support for Autonomy's involvement in the project), the Court has no doubt that a factfinder could find in MicroTech's favor on this issue—particularly viewing the evidence in light most favorable to MicroTech for the purpose of Autonomy's present motion. *See, e.g.*, Bianco Decl. Exs. O−R (internal Autonomy documents discussing the ATIC).

There is also some evidence that weighs in Autonomy's favor. For one thing, Esterrich testified that MicroTech did not face any risk on transactions for commercial end users, because MicroTech did not make payments to Autonomy until it had received a payment on the transaction. *See* Glass Decl. Ex. 23 (Esterrich Dep.) at 29:10–30:6, 87:4–8, 257:20–21. That indicates that MicroTech would have received payment for the Vatican Library and HP transactions before it made payments. There is no dispute that neither transaction ever resulted in a deal with, or payment from, the end user—suggesting that if MicroTech in fact received payment before making payment, it must have received it from Autonomy. Drawing all reasonable inferences in favor of Autonomy, the proximity in time between the ATIC payment from Autonomy to MicroTech and the first multi-million dollar payment[16] from MicroTech to Autonomy for the Vatican Library project, and between Autonomy's payment for the Federal Cloud Platform and MicroTech's early payment in full of the HP transaction invoice, as well as the relationship between the amounts that Autonomy and MicroTech paid on the corresponding transactions, with MicroTech each time receiving slightly more than it paid, all tend to support an inference that the transactions were related. *See* Glass Decl. Exs. 11, 13, 19−22.

---

[16] While the earlier $500,000 payment on that invoice tends to weigh against Autonomy's view of the transaction, drawing all reasonable inferences in Autonomy's favor for the purpose of MicroTech's motion, the Court cannot say this relatively small payment alone defeats the possibility of inferring the relationship Autonomy asserts.

Certain inconsistencies also could, if viewed in the light most favorable to Autonomy, tend to undercut Jimenez's testimony on this subject. Despite Jimenez's characterization of the ATIC as primarily focused on marketing Autonomy products, MicroTech's press release when the ATIC opened included only a fleeting reference to Autonomy—in the "About MicroTech" section, not in the description of the facility—and instead featured testimonials from other vendors about their partnership with MicroTech on the project. Glass Decl. Ex. 3. Esterrich identified Autonomy as only one of many vendors whose products were displayed at the ATIC, and stated that Autonomy did not make a monetary payment to support the project. Glass Decl. Ex. 23 (Esterrich Dep.) at 194:16–195:2, 200:6–201:10. And while Jimenez testified that that the ATIC was ultimately not viable because it cost MicroTech more than Autonomy paid for it, he also characterizes MicroTech's spending on both the ATIC and the Federal Cloud Platform combined as merely "over $10 million," while Autonomy's payments across the two projects totaled close to $18 million—including nearly $10 million for the ATIC alone, which was at least ostensibly designed to provide marketing benefits to MicroTech as well as Autonomy. *See* Glass Decl. Ex. 4 (Jimenez Dep.) at 279:16−280:12, 404:7−8; Glass Decl. Exs. 11, 19−22; Jimenez Decl. ¶ 21. Taken together, and viewed in the light most favorable to Autonomy, these facts could support an inference that the payments Autonomy purportedly made for the ATIC and the Federal Cloud Platform in fact served other purposes.[17] Adding to that inference the similarly of timing and value between Autonomy's payments for the ATIC and Federal Cloud Platform and MicroTech's payments for the Vatican Library and HP transactions, a finder of fact could conclude that the parties intended that Autonomy's payments would fund MicroTech's payments—and conversely, that the mutually understood purpose of MicroTech's payments was simply to repay what it had received from Autonomy, not to purchase software for itself or end users.

---

[17] Adverse inferences drawn from Truitt's invocation of the his right to remain silent under the Fifth Amendment might also support a determination that the transactions involved improprieties, but given that such inferences are only appropriate when there is independent evidence to support the conclusion, even then may be improper under a balancing test, and have not explicitly been sought here by Autonomy, the Court does not rely on Truitt's invocation of the Fifth Amendment in resolving the present motions. *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264−67 (9th Cir. 2000).

Accordingly, taking the facts and inferences discussed above together, a trier of fact could find any number of permutations of agreements and facts—ranging from (1) a simple contract to purchase software that Autonomy may or may not have failed to adequately deliver after MicroTech paid for it, unrelated to the legitimate but ill-fated ATIC and Federal Cloud Platform deals; to (2) an agreement in which MicroTech would be reimbursed if Autonomy failed to close deals with end users, which Autonomy failed to honor when the negotiations with certain end users fell apart; to (3) a scheme to move large amounts of money from Autonomy through MicroTech and back to Autonomy under false pretenses, which both parties honored through the fraudulent Vatican Library/ATIC and HP/Federal Cloud Platform pairs of transactions. Both parties' motions for summary judgment on MicroTech's claims that Autonomy breached its agreement with MicroTech with respect to the Vatican Library and HP transactions are DENIED.

### 2. Autonomy's Collateral Arguments

Autonomy also contends that it is entitled to summary judgment on MicroTech's contract claims based on waiver, and because MicroTech cannot defeat summary judgment by presenting a different theory than it pled in its complaint.

With respect to waiver, Autonomy must demonstrate MicroTech's "intentional relinquishment of a known right after full knowledge of the facts." *Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 80 Cal. App. 4th 666, 678 (2000) (citation omitted). Viewing the factual record in the light most favorable to MicroTech, the Court is not persuaded that MicroTech's representations to Autonomy's auditors regarding the validity of the invoices at issue necessarily constitute an intentional waiver of a known right, with full knowledge of the facts. Depending on how conflicting evidence is resolved, the record here could support a conclusion, for example, that MicroTech's officers who signed the audit letters believed based on the parties' course of dealing that certification of the outstanding invoices would be understood as reserving an expectation of reimbursement if a given deal was not closed with the end user. The record could also support a conclusion that MicroTech's officers were not aware of all relevant facts when they certified the audit letters, in that they did not then know that negotiations with the end users had broken down. Other interpretations might also be possible. Autonomy is not entitled to summary judgment on

35

this basis.

Autonomy also argues that MicroTech waived its contract claims by failing to bring them sooner. Although inaction can constitute a waiver of certain rights in certain circumstances, *e.g.*, *Nat'l Farm Workers Serv. Ctr., Inc. v. M. Caratan, Inc.*, 146 Cal. App. 3d 796, 804 (1983) (finding waiver of a right to arbitrate by a party that failed to invoke it in a timely manner after its opponent filed its complaint), the Court agrees with MicroTech that there does not appear to be "a single case in California where a waiver of a right to file a breach of contract claim has been found based solely upon the non-breaching party filing its claim near the end, but within, the relevant statute of limitations." *See* MicroTech Reply at 9 n.39. Autonomy does not argue that MicroTech failed to file within the statute of limitations. Where the law provides a particular period in which to bring a claim, it is difficult to see how one could infer a party's "*intentional* relinquishment" of such a claim from the party's decision to wait until near—but still before—the end of that period to file. *See Old Republic*, 80 Cal. App. 4th at 678. Autonomy's motion for summary judgment based on waiver is DENIED.

Finally, Autonomy argues that MicroTech cannot rely on a theory of amendment by conduct to defend its contract claims, because it did not explicitly plead such a claim in its complaint. The Ninth Circuit has addressed in the context of the Age Discrimination in Employment Act ("ADEA") the question of whether a plaintiff can invoke a theory not stated in the complaint to survive a motion for summary judgment:

> Allowing Jeney, Gentile and Coleman to proceed with their disparate impact theory after the close of discovery would prejudice Quaker. A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations. A disparate impact theory, lacking the requirement that the plaintiff prove intent and focusing on statistical analyses, requires that the defendant develop entirely different defenses, including the job relatedness of the challenged business practice or its business necessity. Neither of these are necessary to defend against a disparate treatment theory. This case illustrates the problem. At no time prior to summary judgment, did Jeney, Gentile, or Coleman identify which facially neutral Quaker employment practice they challenged as having a discriminatory impact. *Cf. Josey* [*v. John R. Hollingsworth Corp.*, 996 F.2d 632, 642 (3d Cir. 1993)]. The district court judge's opinion indicates that after more than two years of discovery, he had no idea until the employees' motions for summary judgment were filed that they

> intended to pursue this legal theory. The lack of notice on this issue
> central to the cause of action makes it difficult, if not impossible, for
> Quaker to know how to defend itself. After having focused on
> intentional discrimination in their complaint and during discovery,
> the employees cannot turn around and surprise the company at the
> summary judgment stage on the theory that an allegation of
> disparate treatment in the complaint is sufficient to encompass a
> disparate impact theory of liability.

*Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–93 (9th Cir. 2000). The Ninth Circuit went on

to hold that plaintiffs cannot proceed on a disparate impact theory in an ADEA case unless either

(1) the theory is pleaded in the complaint, or (2) the plaintiffs "make known during discovery their

intention to pursue recovery on the disparate impact theory omitted from their complaints." *Id.* at

1294.

      *Coleman* provides an appropriate framework for analyzing Autonomy's argument. The

distinction between a claim on a written contract and a claim based on modifications to that

contract implied by conduct is comparable to the distinction between a disparate treatment and

disparate impact claim under the ADEA, and courts have applied *Coleman* in other contexts as

well. *See, e.g.*, *Patel v. City of Long Beach*, 564 F. App'x 881, 882 (9th Cir. 2014) (citing

*Coleman* to affirm summary judgment where a plaintiff asserted a claim for denial of access to

courts, but raised a claim for retaliation in violation of the First Amendment for the first time in

opposition to summary judgment).

      As one district court has noted, the *Coleman* analysis "focused on prejudice to the

defendant." *Pena v. Taylor Farms Pac., Inc.*, No. 2:13-CV-01282-KJM-AC, 2014 WL 1330754,

at *4 (E.D. Cal. Mar. 28, 2014). It is difficult to see how Autonomy can claim prejudice from

MicroTech's theory that the parties' course of conduct differed in some respects from the Reseller

Agreement, given that Autonomy's own counterclaim alleges as much. *See* Counterclaim ¶ 13

(alleging an agreement and course of conduct in which MicroTech would not use its own money

to purchase Autonomy products, and would be made whole if no sale was made to an end user).

Moreover, even if Autonomy was not put on notice by the pleadings, *Coleman* also allows an

unpled theory to proceed where the defendant is put on notice of intent to pursue that theory

during discovery. Here, if nothing else, Esterrich's deposition testimony regarding the parties'

course of conduct and his understanding of the nature of their agreement with respect to

37

commercial end users would have put Autonomy on notice of MicroTech's view that the written terms of the Reseller Agreement did not fully capture the parties' agreement. Autonomy's counsel asked copious questions during depositions regarding the parties' course of conduct and understanding their respective obligations, and Autonomy does not plausibly explain any way in which it was prejudiced by MicroTech's failure to clearly plead a theory of implied-by-conduct amendment in its complaint. The Court finds that Autonomy had adequate notice of that theory and was not prejudiced.

To the extent that Autonomy's argument could also be construed as directed to MicroTech's theory that Autonomy failed to deliver license keys as required by the express terms of the Reseller Agreement, MicroTech's complaint is sufficient to put Autonomy on notice of that theory. The complaint asserts that Autonomy's breach was in "failing to close the Vatican Library deal in due course or repay MicroTech on the Vatican Library transaction" and "failing to close the software [sic, presumably intended to be 'deal'] in due course or repay MicroTech on the HP-End-User transaction." Compl. ¶¶ 33, 38. While it is perhaps not obvious that this language on its face encompasses failure to provide license keys, the complaint as a whole provides further clarity. MicroTech's factual allegations specify that Autonomy failed to "close[] the software deal[s] . . . *by delivering the software* to the Vatican [or HP], or having repaid MicroTech." *Id.* ¶ 21 (emphasis added); *see id.* ¶ 25 (addressing the HP transaction). An earlier footnote explains MicroTech's view that "[i]n order for the software to be fully 'delivered,' Autonomy must have provided not only software access to MicroTech or the end-user, but also have provided the license keys to use Autonomy's proprietary software," and that "the software alone is useless without the required license keys." *Id.* ¶ 12(g) n.2.

Autonomy's motion for summary judgment on the basis of MicroTech's failure to identify its theories of recovery is DENIED.

### C. Autonomy's Aiding and Abetting Claim

MicroTech moves for summary judgment in its favor on Autonomy's claim that MicroTech aided and abetted Autonomy's former directors' breach of fiduciary duty to Autonomy. Autonomy does not seek summary judgment on this claim.

"Under California . . . law, to state a cause of action against a corporate entity for aiding and abetting a fiduciary's breach of his or her duty of loyalty, a plaintiff must allege (1) knowledge of the fiduciary's breach and (2) substantial participation in the breach." *AngioScore, Inc. v. TriReme Med., LLC*, 70 F. Supp. 3d 951, 957 (N.D. Cal. 2014) (citing *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144 (2005)). The parties here agree that this test necessarily includes as an element that the fiduciary in fact breached his or her duty. MicroTech Mot. at 15; Autonomy Opp'n at 16. MicroTech contends that there is no evidence of either a breach by Autonomy's former directors or knowledge of such a breach by MicroTech. Autonomy argues that such a breach and knowledge can be inferred from the fact that, based on Esterrich's deposition testimony and Jimenez's declaration, MicroTech was being paid to take no action to market software and also to take no risk—essentially, to do nothing. Autonomy Opp'n at 13−16.

MicroTech is correct that there is no direct evidence of misconduct by former Autonomy directors. Nevertheless, as discussed above, the Court finds that, drawing a number of inferences in favor of Autonomy, a trier of fact could find on this record that MicroTech and Autonomy reached an agreement whereby Autonomy would ostensibly pay MicroTech for the ATIC and Federal Cloud Platform projects, but most of that money would be returned to Autonomy ostensibly as payment for the Vatican Library and HP transactions. If that is so, a factfinder could also determine that MicroTech misrepresented the nature of those purported debts when it repeatedly certified their validity (and that they were not subject to side agreements) to Autonomy's auditors. The fact that Steven Truitt maintained a separate accounting system for commercial end-user transactions to which MicroTech's chief financial officer Tomas Esterrich did not have access, and that he was not forthcoming when Esterrich asked for information from that system, could also weigh in favor of inferring misconduct and awareness of misconduct.[18] MicroTech's lack of active work or risk in the transactions at issue might also suggest impropriety, particularly with respect to the Vatican Library transaction, where it is less clear why Autonomy would benefit from MicroTech's small and disadvantaged business certifications under

---

[18] Once again, for the purpose of this order, the Court declines to rely on any adverse inference from Truitt's invocation of the Fifth Amendment.

United States government contracting programs.  Taking the record as a whole, a finder of fact could determine that Autonomy directors breached their fiduciary duties to the company by using corporate funds to pay MicroTech a commission to cycle Autonomy's money back to Autonomy while misrepresenting the nature of a number of payments in both directions, as well the nature of purported outstanding debts.  The factfinder could also infer from the numerous misrepresentations that MicroTech would necessarily make under such a scenario, as well as the business experience of MicroTech's officers, that MicroTech was aware that the Autonomy directors involved in the scheme were in breach of their fiduciary duty, and that MicroTech played a significant role in aiding that breach.

This is, of course, not the only permissible inference from the record.  As also discussed above, a factfinder could determine that the ATIC and Federal Cloud Platform were legitimate projects, and that Autonomy's payments for those programs had no relation to the commercial end-user transactions at issue.  A factfinder could also credit Jimenez's testimony that despite its passive role, MicroTech added legitimate and significant value to transactions by virtue of its disadvantage business certifications.  Although, as noted above, that explanation is less plausible for a customer like the Vatican Library, Jimenez also testified that MicroTech's involvement adds value because customers "want to do business with minorities" out of a sense of "[s]ocial responsibility."  Glass Decl. Ex. 4 (Jimenez Dep.) at 123:14−20.  As with MicroTech's breach of contract claims, the record lends itself to any number of interpretations of the facts.  Summary judgment is not appropriate under such circumstances.  MicroTech's motion for summary judgment with respect to Autonomy's counterclaim for aiding and abetting breach of fiduciary duty is DENIED.

### D.    Both Parties' Unjust Enrichment Claims

Both parties bring claims for unjust enrichment, and both parties argue that the other's claim cannot proceed because the parties' relationship was governed by a binding agreement.  MicroTech Mot. at 15−16; Autonomy Mot. at 16.  Both parties are correct:

/ / /

/ / /

> [U]njust enrichment is "not a cause of action . . . or even a remedy, but rather a general principle, underlying various legal doctrines and remedies. It is synonymous with restitution." *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004). As such, a claim for unjust enrichment is properly pled as a claim for a contract implied-in-law. It "does not lie when an enforceable, binding agreement exists defining the rights of the parties." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996). California, however, recognizes an exception to the rule that unjust enrichment does not lie when an enforceable contract exists: "Restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason." McBride, 123 Cal. App. 4th at 388.

*Boon Rawd Trading Int'l Co. v. Paleewong Trading Co.*, 688 F. Supp. 2d 940, 956 (N.D. Cal. 2010).

Here, the parties' relationship was governed at least in part by the express terms of the Reseller Agreement, and perhaps by implied amendments that, as discussed above, would nevertheless constitute a binding agreement under California law. Autonomy does not address this issue in its opposition to MicroTech's motion. *See* Autonomy Opp'n at 12−16. MicroTech cites only the rule allowing alternative pleading and a case applying that rule to deny a motion to dismiss an unjust enrichment claim at the pleading stage. MicroTech Opp'n at 16 & n.80 (citing *Weingand v. Harland Fin. Sols., Inc.*, No. C-11-3109 EMC, 2012 WL 3763640, at *4 (N.D. Cal. Aug. 29, 2012)). The present case is no longer at the pleading stage, however, and despite a full factual record having been developed, neither party identifies evidence on which a finder of fact could determine both: (1) that the parties were *not* subject to a binding contract of one form or another; *and* (2) that one party is entitled to recover for the other's unjust enrichment at its expense. Both parties' motions are GRANTED as to the opponent's claim for unjust enrichment.

## IV.   CONCLUSION

For the reasons discussed above, both parties' motions for summary judgment are DENIED with respect to MicroTech's breach of contract claims, MicroTech's motion for summary judgment is DENIED with respect to Autonomy's aiding and abetting counterclaim but

/ / /

/ / /

41

GRANTED with respect to Autonomy's unjust enrichment counterclaim, and Autonomy's motion is GRANTED with respect to MicroTech's unjust enrichment claim.

**IT IS SO ORDERED.**

Dated: May 8, 2017

_____
JOSEPH C. SPERO
Chief Magistrate Judge